STATE OF NORTH CAROLINA v. CHARLES PURCELL MORRIS

No. 438A91

(Filed 19 November 1992)

**Evidence and Witnesses § 1252 (NCI4th)— custodial interrogation—invocation of right to counsel—reinitiation of interrogation—incriminating statement—admission as prejudicial error**

Defendant invoked his right to counsel during custodial interrogation when he responded "I don't know" to an officer's question as to whether he would like to waive his right to counsel and responded "No, because I don't know how much I want to tell you" when asked if he would sign a waiver of counsel form, and his subsequent incriminating statement made without counsel when the officer and the district attorney reinitiated the interrogation is presumed to be involuntary and inadmissible in a prosecution of defendant for first degree murder of the two-year-old daughter of defendant's girlfriend, first degree sexual offense and misdemeanor child abuse. Furthermore, the State failed to show that the admission of defendant's statement was harmless beyond a reasonable doubt where the statement contained admissions to elements of all three charged offenses; the statement contained the only direct evidence that defendant committed the sexual offense; and the evidence presented a close question for the jury as to whether defendant or the child's mother was responsible for the child's death.

**Am Jur 2d, Criminal Law §§ 737, 788, 796; Evidence §§ 529, 556.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Phillips, J., at the 4 March 1991 Criminal Session of Superior Court, Carteret County, upon a jury verdict of guilty of first-degree murder. This Court allowed defendant's motion to bypass the Court of Appeals as to additional judgments on 11 December 1991. Heard in the Supreme Court 5 October 1992.

**STATE v. MORRIS**

[332 N.C. 600 (1992)]

*Lacy H. Thornburg, Attorney General, by Robert J. Blum, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was convicted of first-degree murder, first-degree sexual offense, and misdemeanor child abuse. The victim was Alicia Nicole Tommasone ("Nicole"), the two-year-old daughter of defendant's girlfriend, Renee Tommasone. The offenses occurred in the early morning hours of Sunday, 9 September 1990, in Renee's trailer, which was occupied at the time by defendant, Nicole, and Renee. Defendant's defense was that Renee committed the offenses while under the influence of alcohol and Xanax, a prescription tranquilizer. The defense was significantly undermined, however, by the introduction of a pretrial statement by defendant containing admissions to elements of all three offenses.

The sole question addressed is whether the trial court committed prejudicial error in permitting introduction of the statement, on the grounds that it was obtained in violation of defendant's constitutional rights. U.S. Const. amend. V. We hold that the statement was obtained in violation of defendant's constitutional rights, and that it was prejudicial error to admit it.

Nicole was the daughter of Renee Tommasone and Frank Jenkins. After Nicole's birth, Frank married another woman. Several years before her relationship with Nicole's father, Renee had dated defendant briefly for five or six months. In the fall of 1989, Renee and defendant remet and renewed a relationship. They dated on and off for several months, and in January 1990 defendant moved in with Renee and Nicole for a period of time. At the end of March 1990, Renee and defendant began to have problems, which culminated in a fight during which defendant broke Renee's nose. Although the two reconciled, defendant stopped living full-time at the trailer with Renee and her daughter.

Renee testified at trial about the following events relating to her daughter's death: When she and defendant first started dating, Nicole got along well with defendant. About the time of the March fight, however, Nicole appeared to become afraid of

defendant. Nicole would cry in defendant's presence, would try to leave, would cling to and follow Renee, and at times would vomit or would not eat. Renee tried to keep Nicole away from defendant by taking her to the home of a friend or relative if she knew defendant would be visiting. Nevertheless, there were times when defendant would visit and Nicole would be present.

The Wednesday before Nicole's death, Renee took her to stay with Renee's parents in Havelock, North Carolina. That day, Renee told a friend that she was afraid of defendant and was going to stay with her parents. Renee and Nicole stayed with Renee's parents until Saturday. Defendant called several times, and each time Renee told him she did not want anything more to do with him. When defendant called on Saturday from Renee's trailer, however, Renee agreed to meet him there and talk. She did go, and they did talk. When Renee dropped defendant at the home of his cousin, Sara Jones, defendant agreed for the first time to leave her alone.

That afternoon, after Nicole's nap, Renee took Nicole with her to play with the children of a friend, Dawn Cox. While the children played, the mothers visited and Renee joined Dawn in drinking Tequila. Renee also drank three beers that evening. Other people were present, including a friend of defendant's named Jim. At 6:00 p.m., defendant called Dawn's house from Renee's trailer to ask for a ride to a party. Jim did not know how to get to the trailer, so Renee went with Dawn and Nicole to retrieve defendant and bring him back to Dawn's to meet Jim. Renee had planned to leave Dawn's at 9:30 p.m., Nicole's bedtime, and return to the trailer. She was going to drop a friend, Brenda, at the highway on the way home. When she rose to leave, however, she discovered that defendant had left already with Brenda in Renee's car. Angry, she called defendant's cousin, Sara Jones, to try to find defendant and tell him to return the car. When defendant returned in the car with Brenda, Renee and defendant fought and slapped each other. As defendant left in Jim's car, Renee threw a beer can after the car.

Renee then left Dawn's and arrived home at 10:00 p.m., where she put Nicole to bed wearing a diaper and a T-shirt. Renee smoked some cigarettes and took a Xanax before going to bed at 11:00 p.m. Renee's doctor had prescribed Xanax two or three months before to help Renee sleep at night. The next thing Renee remembered about the evening was waking to take a call from

defendant's cousin, Sara Jones. After talking with Sara, Renee went back to bed and woke next to find defendant on top of her, pulling her hair, slapping her, and yelling at her. He smelled of alcohol. After a few minutes, defendant stopped, rolled over on the bed, and said, "you are not worth it, bitch, bitch."

Renee heard Nicole crying and went to reassure her. Renee saw that the time was 4:23 a.m. When Renee checked on Nicole, she did not notice any injuries, other than preexisting bruises on her finger and shin. Renee smoked a cigarette and went back to her bedroom, where defendant was sleeping. Because he was asleep, Renee felt safe and went back to sleep herself. She did not call the sheriff's department throughout her troubles with defendant, except the one time after the March fight, because she was afraid the authorities would take Nicole away if she continued to be exposed to domestic violence.

The next thing Renee remembered was the telephone ringing at 8:00 a.m. When she rose to answer it, defendant was right on her heels. As she reached for the telephone in the living room, Renee noticed Nicole lying on the floor. She was not concerned, as Nicole was known to rise at night and go to another place to sleep. Renee was surprised, however, that Nicole made no sound as defendant picked her up and carried her to her bedroom. Concerned about Nicole, Renee handed the telephone receiver to defendant and went to Nicole, whom defendant had covered with a blanket over her eyes. When Renee pulled the blanket back, Nicole's eyes were open with the pupils rolled back, her face was covered with burns, and she was "gurgling." Renee began to scream as she carried Nicole to the bathroom to clean the burns. On the other end of the line, Rick Amen heard her scream, "Jesus Christ, Scooter (defendant's nickname), what have you done to my baby. Oh, my God."

When Renee noticed that Nicole had stopped gurgling, she called 911 but had trouble explaining the location of the trailer. During this time, defendant just stood and said nothing. Renee took Nicole to the car, with defendant following, and defendant held Nicole as Renee drove to the hospital. At the hospital, Nicole was in full arrest and had no pulse. Efforts to revive her were not successful.

One of the attending nurses at the hospital noted burns on Nicole's face, neck, and shoulders and bruises on her back, legs,

and left-upper arm. The nurse also noted that the vaginal area was red, with some blood and an opening larger than normal for a child of Nicole's age.

At trial, pathologist Dr. Charles Garrett testified that Nicole had suffered painful second-degree thermal burns from a hot liquid on her upper chest, shoulder, neck and face. Garrett also described second-degree burns on the back of Nicole's neck and on her upper back, which Garrett concluded were caused by a separate, contemporaneous contact with hot liquid. Garrett further noted bruises on Nicole's knuckles and in the web between the thumb and index finger. Bruises on Nicole's legs were trivial.

Garrett's examination of Nicole's genitals revealed blood, which would have come from a half-inch laceration of the vagina made from a round object, possibly an adult finger. Garrett did not find presence of sperm. He did find a pool of blood in the peritoneal cavity behind the kidneys and uterus. The pool of blood came from a tear in a surrounding membrane that would have been caused by some blunt force, force that could have been consistent with bringing a child suddenly and forcefully down on one's knee. Garrett's opinion was that Nicole died from internal bleeding, that she would have lived for an hour or two after being injured, that neither the burns nor the vaginal injury would have caused Nicole to lose consciousness, and that she would have been capable of leaving her bed and walking a short distance.

When officers investigated the trailer on Sunday morning, they found water running into the bathtub and a green dipper in the tub. A test of the water at the trailer revealed that it was hot enough to cause burns within seconds.

While Renee's testimony placed defendant in the trailer during the hours when Nicole would have received her injuries, it was defendant's own words in a signed, pretrial statement that directly implicated him in the charged offenses. At trial, Detective Dennis of the Carteret County Sheriff's Department read the following summary of the statement to the jury:

Charles advised R.O., reporting officer, that he had spent the day with Renee Tommasone and she left about 5 o'clock to go to a party and returned for him at 9 o'clock. Charles advised at the party they got into an argument and Renee slapped him. Charles then advised he left and went to a party at

Sandy Jones's residence. Charles advised he stayed there until 3 o'clock and he left with Jim Gollehon . . . . Jim took Charles to Renee's house. Charles entered through the back door and woke Renee up. Charles tried to talk to Renee and she wouldn't talk. Then the baby started crying and he went into the bedroom to see why she was crying. The baby had thrown up and Charles spanked her. The baby would sometimes put her finger in her throat and make herself throw up for attention. Charles advises that her [sic] took the baby into the bathroom and washed her off in the shower and took a green dipper and poured water on her head. Afterwards he put a clean shirt on her and dried her off. During this time she was still crying and Charles inserted his finger into her vagina. Not for a sexual reason, he was just mad. Charles advises that he did not put anything in her rectum. Charles advised that the baby had a bruise on her and a busted lip when he got there. Charles advised reporting officer, R.O., that he put the baby in the bed and went back and got into the bed with Renee and went to sleep. The phone rang about 8 o'clock and woke them up. When Renee answered the phone, that's when Charles got up and noticed Nicole on the floor with a sheet under her. Charles put her back in the bed and got on the phone. Renee looked at Nicole and said her baby was sick and freaked out. Then they took her to the hospital and Charles gave mouth-to-mouth all the way to the hospital.

Defendant's testimony at trial differed in important respects from the above statement and from Renee's testimony. At trial, defendant testified that during their Saturday meeting, he and Renee had sex. When defendant saw Renee that evening, she was "wasted." Defendant drove Brenda because Renee was too drunk to drive. When defendant and Brenda came back to Dawn's house, Renee jumped on defendant and clawed his face. As defendant left with his friend Jim, Renee threw a tricycle at the car.

Late that night, defendant went to Renee's trailer. As he passed Nicole's room, he heard her crying, checked her, and found that she had vomited. As he was trying to clean her, defendant smacked Nicole on the back of her legs to keep her from spreading the vomit around further. Defendant then took Nicole to the bathroom to clean her. He noticed blood in her diapers. Defendant asked Renee about the blood, but she did not know anything about it. In the bathroom, defendant spread Nicole's legs to see if she was

injured. Defendant denied inserting his finger into Nicole's vagina or telling Dennis that he did. Defendant asserted that he tested the water's temperature before pouring it over Nicole's head.

Besides denying key elements of his pretrial statement, defendant presented evidence suggesting that Renee was responsible for Nicole's injuries and death. Defendant testified that Renee was a good mother except when she drank and took Xanax. When she ingested the two in combination, she would become aggressive and have blackouts. Renee drank many beers and took several Xanax every day. Many of their arguments and fights centered around defendant's displeasure with Renee's excessive drinking, use of Xanax, and treatment of Nicole.

Witnesses for defendant testified that defendant had a loving relationship with Nicole, that Renee drank and used Xanax excessively, and that she abused Nicole when she was under the influence of alcohol and Xanax. Sara Jones, defendant's cousin, testified that she called Renee twice on the night of Nicole's death, once at 2:00 a.m., and both times Renee sounded confused and her speech was slurred. Sara also could hear Nicole crying in the background and heard the sound of a slap. Both Sara and her husband, Carl, testified that after Nicole's death, Renee asked them if they thought she could have killed her own baby. A witness who saw Renee in a bar on the day of Nicole's funeral testified that Renee told some men, "No, I'm not married. I just got rid of my little girl. Oh well, I'm glad it's over with. I didn't need her anyway."

In May 1989, the Department of Social Services ("DSS") had received an allegation that Nicole was neglected. After investigating, Robin Cockerham of DSS had concluded that the allegation was not substantiated. Cockerham was concerned, however, about Renee's use of Xanax. In March 1990, Cockerham had received a second allegation of neglect, based on Nicole's presence during the fight between Renee and defendant in which Renee's nose was broken. This time the complaint was substantiated.

Cockerham discussed the situation with Renee, whom she found to be cooperative, and she explained that Renee needed to avoid fighting in Nicole's presence, as well as excessive drinking. During two subsequent, unannounced home visits, Cockerham did not see anything unusual about the relationship between Renee and Nicole.

On 20 August 1990, Renee told Cockerham she was no longer seeing defendant.

Susan Lansche, a substance abuse counselor, met Renee at the end of May 1990 on a referral from DSS. Lansche administered a chemical dependency test and found nothing alarming. Lansche found stress factors in Renee, and she warned Renee of the potentially addictive quality of Xanax. Lansche found Renee to be "very cooperative" and thought her behavior with Nicole was "very appropriate."

On the other hand, Pamela Piper, another DSS worker, testified on direct that she found Renee to be defensive and angry during a home visit in response to the second neglect allegation. On cross examination, however, Piper testified that Renee was very cooperative and that, if anything, she was too lenient with Nicole. During the home visit, Renee told Piper she and defendant had gotten into the March fight because defendant thought she was too drunk to drive.

The officer who responded to Renee's call about the fight confirmed that Renee was intoxicated; however, defendant also smelled of alcohol. The officer found Renee "belligerent" and defendant "hyper." The officer felt that Renee was "very impaired on something" and that she was not capable of caring for Nicole in her state. As a result, he assisted defendant in calling Nicole's father to come and take her for the evening.

As can be seen, the only direct evidence that defendant committed the charged offenses was defendant's pretrial statement. Defendant disputes the verity of portions of the statement and contends that it was obtained in violation of his invoked right to counsel.

Defendant made the statement to Detective Dennis and District Attorney McFayden at the Carteret County Sheriff's Department at 2:30 p.m. the day of Nicole's death. Dennis first met defendant about 10:00 that morning at the hospital, where Dennis became concerned about defendant's safety, given the high emotions of the Tommasone and Jenkins families.

Based on Dennis' testimony on *voir dire*, the trial court made the following findings of fact about the circumstances surrounding defendant's statement: Dennis had defendant escorted from the hospital to the Morehead Police Department to remove him from

perceived threats to his safety. Shortly before midday, defendant was taken in the company of officers to the Carteret County Sheriff's Department. Dennis joined him there after completing a consensual search of Renee's trailer. Dennis advised defendant of his Miranda rights and asked defendant if he would like to waive his right to counsel. Defendant responded, "I don't know." Dennis then asked defendant if he would sign a waiver of counsel form. Defendant responded, "No, because I don't know how much I want to tell you."

At that point, Dennis discontinued the interrogation. Dennis pursued other matters, including making a telephone call to the District Attorney, while defendant remained in the presence of officers at the Sheriff's Department. At 2:15 p.m., the conversation was revived by Dennis and the District Attorney. Dennis testified that defendant became more emotional and eventually broke down and gave the statement. Dennis reduced the statement to a screen presentation on a computer monitor, which defendant seemed to read. A written copy of the statement was generated, delivered to defendant, studied by him, and signed by him at 3:35 p.m.

Based on its findings of fact, the trial court concluded that at the time defendant made his statement he was in custody. The trial court concluded, however, that under the circumstances defendant made an "implicit waiver" of his right to silence and knowingly, freely, voluntarily, and understandingly waived his right to counsel.

On appeal, the State contends that defendant implicitly waived his rights and that the law recognizes implicit waivers. The State relies on *North Carolina v. Butler*, 441 U.S. 369, 375-76, 60 L. Ed. 2d 286, 293-94 (1979), in which the United States Supreme Court held that an explicit statement of waiver is not invariably necessary to support a finding that a defendant waived the right to remain silent or to have counsel.

As defense counsel notes on appeal, however, the Supreme Court has since clarified that while the right to remain silent can be waived by implication, "additional safeguards are necessary when the accused asks for counsel." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, *reh'g denied*, 452 U.S. 973, 69 L. Ed. 2d 984 (1981). Even before *Edwards*, the Supreme Court had "noted that Miranda had distinguished between the procedural safeguards triggered by a request to remain silent and a request

for an attorney." *Id.; accord Michigan v. Mosley*, 423 U.S. 96, 104 n.10, 46 L. Ed. 2d 313, 321 n.10 (1975).

In the case at bar, the right to counsel is at issue, not the right to remain silent. As the trial court's findings of fact note, Dennis asked defendant if he would like to waive his "right to counsel" and if he would sign a waiver of counsel form. The issue, then, is whether defendant's responses to those questions constituted a waiver of, or an invocation of, the right to counsel.

Defendant's first response—to the question of whether he would like to waive his right to counsel—was "I don't know." His second response—to the question of whether he would sign a waiver of counsel form—was "No, because I don't know how much I want to tell you." "There are no 'magic words' which must be uttered in order to invoke one's right to counsel." *State v. Torres*, 330 N.C. 517, 528, 412 S.E.2d 20, 26 (1992). The question is whether the defendant has indicated "in any manner" that he desires the presence or aid of counsel while being interrogated. *Miranda v. Arizona*, 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707 (1966). We hold that defendant invoked his right to counsel when he refused to sign the waiver form; in effect, his answer to Detective Dennis' question of whether he would sign the waiver of counsel form was "No" because without assistance he did not know what his legal rights and position were, and until he did, he could not know how much he was willing to say.

This Court recently has held that questions posed by a defendant about the need for an attorney and attempts by another defendant to call his attorney constituted invocations of the right to counsel. *State v. Tucker*, 331 N.C. 12, 35, 414 S.E.2d 548, 561 (1992); *Torres*, 330 N.C. at 529-30, 412 S.E.2d at 27. Certainly, defendant's immediate, negative response to Dennis' pointed invitation to waive counsel is at least as indicative of a desire to have the help of an attorney during custodial interrogation as defendant Torres' inquiry as to whether she needed an attorney and defendant Tucker's attempts to call his attorney. Even if the Court were to deem defendant's response an ambiguous invocation, Dennis would have had to cease interrogation "except for narrow questions designed to clarify [defendant's] true intent." *Torres*, 330 N.C. at 529, 412 S.E.2d at 27. In fact, it appears that Detective Dennis initially took this course when he followed defendant's "I don't know" with a more narrow question of whether defendant would sign a waiver

form. Upon receiving an unequivocal "No" to that question, Dennis ceased the interrogation. *Cf. Smith v. Illinois*, 469 U.S. 91, 100, 83 L. Ed. 2d 488, 496 (1984) ("[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.").

Once defendant invoked his right to counsel, he was not subject to further police interrogation until counsel was made available. *Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386; *Tucker*, 331 N.C at 35, 414 S.E.2d at 561. Once Dennis ceased the interrogation, he or his colleagues could only recommence it under two sets of circumstances. The first set of circumstances requires reinitiation of conversation by defendant and a knowing and intelligent waiver of the right to counsel by defendant. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 77 L. Ed. 2d 405, 411-13 (1983); *Tucker*, 331 N.C. at 35-36, 414 S.E.2d at 561. This set of circumstances is not present here because defendant did not reinitiate the conversation. The second set of circumstances involves police-initiated interrogation *once counsel is present. McNeil v. Wisconsin*, --- U.S. ---, ---, 115 L. Ed. 2d 158, 167 (1991); *see also Minnick v. Mississippi*, 498 U.S. 146, ---, 112 L. Ed. 2d 489, 497-98 (1990). This set of circumstances also did not occur as counsel was not present when Dennis and the District Attorney approached defendant for the interview that resulted in the statement.

A valid waiver of the right to counsel cannot be shown merely by the fact that defendant eventually made a statement after being informed of his rights. *Edwards*, 451 U.S. at 484, 68 L. Ed. 2d at 386. In fact, because Dennis and the District Attorney reinitiated interrogation after defendant had invoked his right to counsel, his subsequent statement is presumed to be involuntary and inadmissible. *McNeil*, --- U.S. at ---, 115 L. Ed. 2d at 167-68.

Because the error in admitting defendant's statement was of constitutional dimension, the State has the burden of demonstrating that admission of the statement was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988); *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, *reh'g denied*, 386 U.S. 987, 18 L. Ed. 2d 241 (1967); *Tucker*, 331 N.C. at 37-38, 414 S.E.2d at 562. We hold that the State has failed to meet that burden. The statement contained admissions to elements of all three charged offenses: 1) defendant's admission that he spanked Nicole could account for the fatal injury to Nicole's abdomen; 2) defendant's

admission that he poured water over Nicole's head could account for the burns; and 3) most importantly, defendant's admission that he inserted his finger into Nicole's vagina is the only direct evidence that defendant committed the sexual offense. Without the statement, the State would have been left with the following: circumstantial evidence that placed both defendant and Renee in the trailer during the critical hours, testimony by both defendant and Renee that they poured water from the tub faucet over Nicole on the morning of her death, and evidence that both defendant and Renee may have smacked or slapped Nicole sometime during the early morning hours. Even with the benefit of defendant's pretrial statement, containing the only direct evidence of the sexual offense, the State recognized that the question for the jury came down to which of these two adults was responsible for Nicole's death; during closing arguments, the prosecutor posed the following question to the jury: "One of the two of them did it? Is it Renee or the defendant?" Given the recognized closeness of the question, we are not satisfied beyond a reasonable doubt that defendant was not prejudiced by introduction of the statement.

Because the pretrial statement was admitted in violation of defendant's federal constitutional rights and to defendant's prejudice, we award defendant a new trial.

NEW TRIAL.