STATE OF NORTH CAROLINA v. CURLEY JACOBS AND BRUCE LEE McMILLIAN

No. COA04-541

(Filed 18 October 2005)

**1. Appeal and Error— preservation of issues—failure to argue**

Assignments of error that were not presented in defendants' briefs are deemed abandoned pursuant to N.C. R. App. P. 28(b)(6).

**2. Confessions and Incriminating Statements— custodial statement—motion to suppress**

The trial court did not err in an impersonation of a law enforcement officer, armed robbery, burglary, and kidnapping case by denying defendant's motion to suppress his custodial statement, because: (1) the trial court was not required to make written findings of fact when there was no material conflict in the evidence of this case; (2) the waiver form signed by defendant on 6 August 2002 indicated that he was willing to make a statement and answer questions and that he did not want a lawyer at that time; (3) defendant failed to introduce any evidence during the suppression hearing tending to show he invoked his right to counsel on 6 August 2002, and if anything, he invoked his right to remain silent regarding an unrelated incident; and (4) law enforcement officials involved in the investigation of the pertinent incident honored defendant's invocation of his right to remain silent regarding an unrelated incident.

1

### 3. Evidence— prior crimes or bad acts—impersonation of law officers—instruction on limited purpose

The trial court did not abuse its discretion in an impersonation of a law enforcement officer, armed robbery, burglary, and kidnapping case by admitting evidence of defendant's prior bad acts including defendant dressing up as a law enforcement officer and robbing another individual at his home two days after the robbery of the victims in this case, because: (1) both incidents involved the assailants' entry into the victim's residence under the auspices of legitimate law enforcement activity, the assailants in both incidents were dressed as law enforcement officers and displayed a search warrant as well as firearms in an effort to gain entry into the respective residences, and the assailants in both incidents bound their victims by using plastic handcuffs once they were inside the home and searched the residence for "illegal" items; and (2) the trial court repeatedly instructed the jury regarding the limited purposes for which the evidence of the unrelated incident could be used.

### 4. Evidence— prior inconsistent statements—impeachment— refreshing memory with prior custodial statements

The trial court did not err in an impersonation of a law enforcement officer, armed robbery, burglary, and kidnapping case by admitting evidence of two coparticipants' prior inconsistent statements when the State impeached the coparticipants with their prior custodial statements after allowing them to refresh their memory by looking through their statements, because: (1) the record demonstrates the coparticipants were testifying contrary to the expectations of the State and there is no indication that the State called the witnesses or used their impeachment as a mere subterfuge to get evidence before the jury which was otherwise inadmissible; and (2) the trial court instructed the jury that when evidence has been received tending to show that at an earlier time a witness made a statement which may be consistent or may conflict with his testimony, the jury must not consider such earlier statement as evidence of the truth of what was said at the earlier time.

### 5. Evidence— cross-examination—limitation

The trial court did not err in an impersonation of a law enforcement officer, armed robbery with a dangerous weapon, burglary, and kidnapping case by limiting the cross-examination

STATE v. JACOBS

[174 N.C. App. 1 (2005)]

of a State's witness including questions regarding the witness's prior convictions for simple assault and probationary status, and regarding a transcript of plea the witness signed prior to defendant's trial, because: (1) assuming arguendo that the trial court erred, defendant is not entitled to a new trial when the witness's testimony focused on his own kidnapping and robbery rather than those charges defendant faced at trial, and another coparticipant provided a similar account of the incident detailing defendant's involvement in it during his testimony; (2) the witness's statement to a detective was admitted into evidence along with his photographic identification of defendant and a coparticipant; (3) defense counsel was allowed to question the witness regarding his current incarceration, his conviction for possession of a firearm on educational property, his conviction for possession of a firearm by a felon, his conviction for driving after consuming an alcoholic beverage, his conviction for resisting a public officer, and his conviction for violating a domestic violence order; and (4) with respect to the plea transcript, although the trial court stated that there was nothing in the papers requiring the witness to testify in this case, the trial court instructed defense counsel that he was allowed to ask the witness if he got some consideration for his testimony.

**6. Evidence— codefendants' custodial statement—no powerfully incriminating characteristics**

Defendant's right of confrontation was not denied by the trial court's ruling allowing a detective to read the codefendant's custodial statement to the jury, because: (1) the use of the word "we" in the codefendant's redacted statement did not clearly implicate defendant; and (2) the statement did not contain those powerfully incriminating characteristics requiring reversal under the Confrontation Clause.

**7. Sentencing— aggravating factors—failure to submit to jury**

The trial court erred in an impersonation of a law enforcement officer, robbery with a dangerous weapon, first-degree burglary, and double second-degree kidnapping case by sentencing defendant in the aggravating range without submitting the aggravating factors to the jury for proof beyond a reasonable doubt, and the case is remanded for resentencing.

**8. Indigent Defendants— attorney fees—court-appointed attorney—notice and opportunity to be heard**

The trial court erred in imposing attorney fees upon defendant for his court-appointed attorney pursuant to N.C.G.S. § 7A-455, and the case is remanded for a hearing, because while the transcript reveals that attorney fees were discussed following defendant's conviction, there was no indication that defendant was notified of and given an opportunity to be heard regarding his appointed attorney's total hours or the total amount of fees imposed.

**9. Criminal Law— prosecutor's argument—not comment on defendants' failure to testify**

The prosecutor did not improperly comment on defendants' failure to testify by his statements during his closing argument that the jury "did hear from the defendants" and that "they made statements" where the prosecutor was referring to statements made by defendants following their arrest. Furthermore, the trial court did not err by instructing the jury that defendants were under no obligation to testify during trial.

**10. Evidence— codefendant's redacted custodial statement— replacing defendant's name with word "someone"**

The trial court committed harmless error, if any at all, in an impersonation of a law enforcement officer, armed robbery, burglary, and kidnapping case by allowing the State to introduce a redacted version of the codefendant's custodial statement where defendant's name was replaced with the word "someone," because: (1) assuming arguendo that it was improper for the trial court to allow a detective to read the redacted version of the codefendant's statement, defendant is not entitled to a new trial when the State presented overwhelming evidence to establish defendant's guilt notwithstanding the codefendant's statement, including testimony from a victim and a coparticipant which tended to show that defendant entered the victim's residence during the incident and was referred to by the name "Sarge;" and (2) defendant's own statement to law enforcement officers described his involvement in the incident, including his getting out of the car, walking to the house, and telling a coparticipant they needed to go.

**11. Criminal Law— motion to sever trial—unrelated incident**

The trial court did not abuse its discretion in an impersonation of a law enforcement officer, armed robbery, burglary, and kidnapping case by failing to grant defendant's motion to sever the trial, because defendant was not identified as a participant in any stage of an unrelated incident, and the trial court twice instructed the jury regarding the limited use of the evidence including that it was limited to the codefendant.

**12. Kidnapping— second-degree—instruction—plain error analysis**

The trial court did not commit plain error by instructing the jury that it could convict defendant of second-degree kidnapping if it found that the victims were restrained "for the purpose of commission of burglary and armed robbery" when the indictment alleged that the victims were restrained " for the purpose of facilitating the commission of . . . robbery" because (1) the trial court's instruction actually added a second crime to the purpose of the restraint thereby placing a higher burden of proof on the State; and (2) compelling evidence supported the additional theory submitted by the trial court, and the jury found defendant guilty of the crime giving rise to it.

Judge LEVINSON concurring in part and dissenting in part.

Appeal by defendants from judgments entered 29 September 2003 by Judge Gary L. Locklear in Robeson County Superior Court. Heard in the Court of Appeals 3 March 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General Alexander McC. Peters and Special Deputy Attorney General Karen E. Long, for the State.*

*Stubbs, Cole, Breedlove, Prentis & Biggs, P.L.L.C., by C. Scott Holmes, for defendant-appellant Curley Jacobs.*

*Ligon and Hinton, by Lemuel W. Hinton, for defendant-appellant Bruce Lee McMillian.*

TIMMONS-GOODSON, Judge.

Curley Jacobs ("Jacobs") and Bruce Lee McMillian ("McMillian") (collectively, "defendants") appeal their convictions for impersonation of a law enforcement officer, robbery with a dangerous weapon, first-degree burglary, and two counts of second-degree

kidnapping. For the reasons discussed herein, we hold that both defendants received a trial free of prejudicial error, but we vacate the trial court's imposition of attorney's fees upon Jacobs and remand his case for resentencing.

The State's evidence presented at trial tends to show the following: In the early morning hours of 30 July 2002, defendants, William Robert Parker ("Parker"), Sharrone Brayboy ("Brayboy"), and George Allen Locklear ("Locklear") drove to a residence in Shannon, North Carolina, owned by Lee Otis Chavis ("Mr. Chavis"). At approximately 1:00 or 1:30 a.m., Mr. Chavis heard a knock at the front door of his residence. When Mr. Chavis opened the door, Parker and Brayboy were standing on the front steps. Parker and Brayboy were dressed in "real thin blazers" that had the letters "DEA" on them, and they both had a "badge" on their belts "like a detective would wear it." Parker and Brayboy informed Mr. Chavis that they were looking for him. Mr. Chavis noticed that Parker was holding a "chrome looking" handgun in his hand. After Mr. Chavis asked to "see the warrant[,]" Brayboy, who was holding a double-barreled shotgun, told Mr. Chavis that if he did not open the door, he would be shot. Parker and Brayboy thereafter entered Mr. Chavis' residence, forced him to the floor of the living room, and bound his hands behind his back with plastic handcuffs. Parker and Brayboy then attempted to subdue Goldie Chavis ("Mrs. Chavis"), Mr. Chavis' wife. Mr. Chavis convinced Parker and Brayboy to allow Mrs. Chavis to use the restroom. Mrs. Chavis thereafter went to her bedroom in an effort to change clothes. After she changed her clothes, Parker and Brayboy bound Mrs. Chavis' hands behind her back and brought her to the living room. Mr. Chavis heard Parker and Brayboy searching the rooms of his residence, and he heard Brayboy "yank[] out all the drawers and all the dressers[.]" Eventually, Parker and Brayboy encountered Mr. Chavis' son, Benson Chavis ("Benson"), in a back bedroom of the residence. Parker and Brayboy bound Benson's hands behind his back and brought him into the living room as well.

As Parker and Brayboy were "tearing up everything in the bedroom[,]" McMillian entered the residence. Parker and Brayboy called McMillian "Sarge," and they informed the Chavises that "they were going to need to talk to him to see what they were going to do" and that "there w[ere] some more guys across the road raiding a house[.]" Parker, Brayboy, and McMillian thereafter left the Chavis residence. After the three men left the area, Benson freed himself from his handcuffs and cut Mr. and Mrs. Chavis' handcuffs. Following a search of

their residence, the Chavises determined that the three men had taken several firearms and approximately $1,700.00 in cash.

After leaving the Chavis residence, Parker, Brayboy, and McMillian joined Jacobs and Locklear, who were waiting outside the residence. The five men left in two vehicles, one of which was an older model Chevrolet Caprice that had been used by the Robeson County Sheriff's Department. At a subsequent meeting at Locklear's residence, the five men divided Mr. Chavis' firearms and cash, as well as crystal methamphetamine taken from the Chavis residence.

Robeson County Sheriff's Department Detective Reggie Strickland ("Detective Strickland") was dispatched to the Chavis residence to investigate the incident. The Chavises informed Detective Strickland that their assailants had fled in "a brown-ish, burgundy-ish or older model patrol car[.]" After conversing with several other law enforcement officers, Detective Strickland determined that Brayboy was involved in the incident. Brayboy was arrested on 6 August 2002 and interviewed by Detective Strickland. Following the interview, Detective Strickland arrested Parker at Locklear's residence in Maxton, North Carolina. Statements made by Parker during his interview led Detective Strickland to arrest Jacobs on 8 August 2002. At the time of his arrest, Jacobs was in police custody on another charge. McMillian thereafter contacted law enforcement officials and turned himself in on 12 August 2002.

On 4 November 2002, defendants were indicted separately for first-degree burglary, robbery with a dangerous weapon, impersonating a law enforcement officer, and three counts of second-degree kidnapping. Defendants' cases were thereafter joined, and their case proceeded to trial the week of 22 September 2003. Following the close of the State's evidence, the trial court dismissed both charges of second-degree kidnapping of Benson. On 29 September 2003, the jury found both defendants guilty of first-degree burglary, robbery with a dangerous weapon, impersonating a law enforcement officer, second-degree kidnapping of Mr. Chavis, and second-degree kidnapping of Mrs. Chavis. After making findings of fact in aggravation and mitigation and determining that he had a prior felony record level II, the trial court sentenced Jacobs to a total of 131 to 176 months imprisonment. After making findings of fact in aggravation and mitigation and determining that he had a prior felony record level III, the trial court sentenced McMillian to a total of 109 to 150 months imprisonment. Defendants appeal.

**[1]** Although they submitted a joint record on appeal, defendants filed separate briefs with this Court. We note initially that neither defendant provided argument in his brief for all of his original assignments of error. Pursuant to N.C.R. App. P. 28(b)(6) (2005), the omitted assignments of error are deemed abandoned. Therefore, we limit our present review to those assignments of error properly preserved by defendants for appeal.

### *Jacobs' Appeal*

The issues in Jacobs' appeal are whether the trial court erred by: (I) denying his motion to suppress his custodial statement; (II) admitting evidence of his prior bad acts; (III) admitting evidence of Parker and Brayboy's prior inconsistent statements; (IV) limiting the cross-examination of a State's witness; (V) admitting McMillian's statement into evidence; (VI) sentencing him in the aggravated range; and (VII) imposing attorney's fees upon him.

### *I. Motion to Suppress*

**[2]** Jacobs first argues that the trial court erred by denying his motion to suppress his custodial statement. Jacobs asserts that the interrogation giving rise to the statement violated his constitutional rights. We disagree.

In ruling on a motion to suppress a custodial statement, " '[t]he trial court makes the initial determination as to whether an accused has waived his right to counsel.' " *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000) (citations omitted), *cert. denied*, 531 U.S. 1165, 148 L. Ed. 2d 992 (2001). N.C. Gen. Stat. § 15A-977(f) (2003) requires the trial court to "set forth in the record [the] findings of fact and conclusions of law" supporting its determination. In the instant case, the record indicates that although the trial court failed to make any written findings and conclusions to support its denial of Jacobs' motion to suppress, the trial court did provide rationale from the bench. Our Supreme Court has previously stated that "[i]f there is no material conflict in the evidence on voir dire, it is not error to admit the challenged evidence without making specific findings of fact . . . . In that event, the necessary findings are implied from the admission of the challenged evidence." *State v. Phillips*, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980) (citations omitted). As there is no material conflict in the evidence of this case, we conclude that the trial court did not err by failing to make written findings of fact and conclusions of law.

STATE v. JACOBS

[174 N.C. App. 1 (2005)]

Prior to trial, Jacobs filed a motion to suppress his custodial statement to Detective Strickland, arguing that he had "asserted his right to counsel prior to the interrogation" by Detective Strickland on 8 August 2002. At the suppression hearing, defense counsel questioned Robeson County Sheriff's Department Lieutenant James Carter ("Lieutenant Carter") regarding a *Miranda* waiver form signed by Jacobs on 6 August 2002. Lieutenant Carter testified that Jacobs was taken into custody on that date for the alleged armed robbery of another individual, James Morgan ("Morgan"). Lieutenant Carter testified that after he read the *Miranda* warnings to him, Jacobs "signed [the waiver form], and that was the end of it." Lieutenant Carter elaborated as follows:

Q. He wouldn't give you a statement?

A. That was the end of it.

Q. Did you ask him to make a statement?

A. Yes, sir, I did, and he didn't.

Q. He didn't.

A. That was the end of that.

Q. Now, did you ever question him again after that questioning?

A. No, sir.

Further testimony from the suppression hearing revealed that although Lieutenant Carter did not thereafter question Jacobs regarding the Morgan incident, Detective Strickland did question him regarding the Chavis incident. On cross-examination, Detective Strickland testified that when he questioned Jacobs on 8 August 2002, he was not aware that Jacobs had an attorney appointed to represent him regarding the Morgan incident, but that he "knew [Jacobs] was in jail on other charges not related to" the armed robbery of the Chavises. Detective Strickland acknowledged that he initiated the questioning of Jacobs on 8 August 2002, and he testified that Jacobs willingly waived his *Miranda* rights and confessed to the Chavis incident while in custody for the Morgan incident.

We recognize that the waiver form signed by Jacobs on 6 August 2002 indicated that he was "willing to make a statement and answer questions" and that he "d[id] not want a lawyer at th[at] time." However, we also recognize that "a criminal defendant who has been advised of and has waived his [Fifth Amendment] rights has the right

to terminate a custodial interrogation by indicating 'in any manner, [and] at any time prior to or during questioning, that he wishes to remain silent.' " *State v. Murphy*, 342 N.C. 813, 823, 467 S.E.2d 428, 434 (1996) (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723 (1966)) (alteration in original). Accordingly, we conclude that by refusing to offer a statement to Lieutenant Carter on 6 August 2002, Jacobs invoked his Fifth Amendment rights to avoid custodial interrogation regarding the Morgan incident, notwithstanding his prior waiver of that right. However, we are not convinced that Jacobs' invocation of his rights to avoid custodial interrogation regarding the Morgan incident impacted Detective Strickland's subsequent interrogation regarding the Chavis incident.

While the immediate effect of a defendant's invocation of his or her Fifth Amendment rights is the same regardless of which right is invoked in particular, *see, e.g.*, *Murphy*, 342 N.C. at 823, 467 S.E.2d at 434 (holding that interrogation must immediately cease upon invocation of right to remain silent) and *State v. Morris*, 332 N.C. 600, 610, 422 S.E.2d 578, 584 (1992) (holding that interrogation must immediately cease upon invocation of right to counsel), our Supreme Court has noted that the right to remain silent and the right to counsel "differ[] slightly" in effect, and therefore it has declined to expand the requirements regarding a counsel-based invocation to those instances where the defendant "only" invoked his or her right to remain silent. *Murphy*, 342 N.C. at 823 n.1, 467 S.E.2d at 434 n.1. Where a defendant has invoked his or her Fifth Amendment right to remain silent, the admissibility of statements thereafter obtained " 'depends under *Miranda* on whether [the] right to cut off questioning was scrupulously honored.' " *Murphy*, 342 N.C. at 823, 467 S.E.2d at 434 (quoting *Michigan v. Mosley*, 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321 (1975)) (quotation marks omitted). However, where a defendant has invoked his or her Fifth Amendment right to counsel, the admissibility of statements thereafter obtained depends upon the voluntariness of the defendant's subsequent waiver of the right to counsel as well as the presence of counsel during subsequent questioning. *Morris*, 332 N.C. at 610, 422 S.E.2d at 584 ("Once [a law enforcement officer] cease[s] the interrogation, [the law enforcement officer] or his colleagues could only recommence it under two sets of circumstances. The first set of circumstances requires reinitiation of conversation by [the] defendant and a knowing and intelligent waiver of the right to counsel by [the] defendant. . . . The second set of circumstances involves police-initiated interrogation *once counsel is*

*present.*") (citations omitted) (emphasis in original). In the instant case, Jacobs failed to introduce any evidence during the suppression hearing tending to show that he invoked his right to counsel on 6 August 2002. Instead, the uncontradicted testimony indicates that if he invoked either of the Fifth Amendment rights, Jacobs invoked his right to remain silent regarding the Morgan incident.

In *Mosley*, the defendant was arrested for his alleged involvement in a series of robberies and, during questioning regarding the robberies, invoked his Fifth Amendment right to remain silent. Several hours later, a different officer removed the defendant from his cell and, after reading the defendant his *Miranda* rights, questioned the defendant regarding a murder unrelated to the robberies. The defendant thereafter confessed to the murder, and on appeal of his subsequent conviction, he argued that the second interrogation violated his Fifth Amendment rights. The Supreme Court disagreed, concluding that the confession arising from the second interrogation was admissible during the defendant's murder trial because law enforcement officials had "scrupulously honored" the defendant's right to "cut off questioning" regarding the robberies. 423 U.S. at 104, 46 L. Ed. 2d at 321. In support of this conclusion, the Court noted that law enforcement officials "immediately ceased" the initial interrogation after the defendant invoked his right to remain silent, that law enforcement officials attempted no further interrogation until "an interval of more than two hours" had occurred, and that the defendant was provided "full and complete *Miranda* warnings" prior to initiation of the second interrogation, which focused "exclusively on . . . a crime different in nature and in time and place of occurrence" when compared to the initial interrogation. 423 U.S. at 104-05, 46 L. Ed. 2d at 321-22.

In the instant case, uncontradicted evidence introduced during the suppression hearing supports a conclusion that the law enforcement officials involved in the investigation of the Chavis incident "scrupulously honored" Jacobs' invocation of his right to remain silent regarding the Morgan incident. As detailed above, Lieutenant Carter testified that "[t]hat was the end of that" when Jacobs refused to make a statement regarding the Morgan incident, and that he did not thereafter question Jacobs regarding the charges. Detective Strickland testified that he questioned Jacobs regarding the Chavis incident on 8 August 2002, approximately two days after Jacobs was questioned regarding the Morgan incident. Detective Strickland testified further that he issued fresh *Miranda* warnings to Jacobs prior to

questioning him regarding the Chavis incident. There is no indication that the second interrogation focused on the Morgan incident, which, although similar in nature to the Chavis incident, is nevertheless different "in time and place of occurrence" and not so like the Chavis incident as to outweigh the other factors suggesting that law enforcement officials "scrupulously honored" Jacobs' Fifth Amendment right to remain silent. Therefore, in light of the foregoing, we conclude that the second interrogation of Jacobs was not unconstitutional under the facts of this case, and the trial court did not err by admitting the statement obtained by law enforcement officials during the interrogation. Accordingly, we overrule Jacobs' first argument.

## II. Evidentiary Issues

[3] Jacobs next argues that the trial court erred by allowing witnesses to testify regarding his prior bad acts. Jacobs asserts that the trial court should have excluded evidence regarding the Morgan incident. We disagree.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2003) provides in pertinent part as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

Our courts have interpreted Rule 404(b) as stating a general rule of inclusion of relevant evidence of other crimes, wrongs, or acts by a defendant, with its lone exception being where the "*only* probative value [of the evidence] is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 279, 389 S.E.2d 48, 54 (1990) (emphasis in original). "Where, however, the evidence tends to prove any other relevant fact, such as an intent or motive to commit a crime charged, the evidence will not be excluded simply because it shows that the defendant is guilty of an independent crime." *State v. White*, 331 N.C. 604, 611, 419 S.E.2d 557, 561 (1992). In addition, "[t]he admissibility of evidence under [Rule 404(b)] is guided by two further constraints—similarity and temporal proximity [of the acts]." *State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993) (citations omitted).

In the instant case, Jacobs was charged with first-degree bur-glary, armed robbery, second-degree kidnapping, and impersonating a law enforcement officer. These charges arose from Jacobs' alleged involvement in a scheme whereby individuals would dress and act like law enforcement officials in an effort to obtain property from others. At trial, the State offered evidence tending to show that two days after the incident involving the Chavises, Jacobs and Brayboy went to Morgan's residence dressed as law enforcement officers, presented Morgan with a pink slip of paper, and informed Morgan that they had "a search warrant to search the house." Morgan testified that Jacobs and Brayboy "had on black fatigues[,]" that "[o]ne of them had on a sheriff's T-shirt[,]" and that "[t]he other one had just regular police right across the front of [his shirt] and had on boots." Morgan further testified that "[o]ne of them had a 12-gauge," and that "[t]he other had a .45." Morgan recalled being bound by plastic handcuffs and placed on the floor of the kitchen while Jacobs and Brayboy took property from his residence, and he remembered Jacobs and Brayboy stating that they were "carrying [the property] outside to run it in, the numbers, [to] check and see if [it was] stolen or anything." Morgan stated that after they took property from his residence, Jacobs and Brayboy placed him in the back seat of an "old brown police car[]" and transported him to "the woods" in Maxton. Morgan recalled Jacobs and Brayboy thereafter removing his handcuffs, searching him again, and rebinding his hands together with duct tape. Morgan testified that Jacobs then ordered him to walk in front of the car, where Jacobs shot him in the feet with the shotgun. On appeal, Jacobs contends that "[b]eyond the relevant evidence that they dressed as law enforcement officers and robbed [Morgan] at his home," the remaining evidence of the Morgan incident was prejudi-cial and thus should have been excluded. We cannot agree.

"Where evidence of prior conduct is relevant to an issue other than the defendant's propensity to commit the charged offense, 'the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403.' " *State v. Stevenson*, 169 N.C. App. 797, 800, 611 S.E.2d 206, 209 (2005) (quoting *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988)). Thus, "once a trial court has deter-mined the evidence is admissible under Rule 404(b), the court must still decide whether there exists a danger that unfair prejudice sub-stantially outweighs the probative value of the evidence." *Stevenson*,

169 N.C. App. at 800-01, 611 S.E.2d at 209; N.C. Gen. Stat. § 8C-1, Rule 403 (2003). "That determination is within the sound discretion of the trial court, whose ruling will be reversed on appeal only when it is shown that the ruling was so arbitrary that it could not have resulted from a reasoned decision." *State v. Bidgood*, 144 N.C. App. 267, 272, 550 S.E.2d 198, 202, *cert. denied*, 354 N.C. 222, 554 S.E.2d 647 (2001).

In the instant case, we are not persuaded that the trial court abused its discretion by ruling that the evidence regarding the Morgan incident was admissible. The Morgan incident occurred two days after the incident involving the Chavises, and, as detailed above, it also involved the assailants' entry into the victim's residence under the auspices of legitimate law enforcement activity. The assailants in both the Morgan and Chavis incidents were dressed as law enforcement officers and displayed a "search warrant" as well as firearms in an effort to gain entry into the respective residences. Once inside, the assailants in both incidents bound their victims by using plastic handcuffs and searched the residences for "illegal" items. At the conclusion of both incidents, the assailants left in what was consistently described as an older model law enforcement vehicle. The record reflects that the trial court was aware of the possible prejudice stemming from the dissimilarities of the incidents (including the fact that Morgan was shot), and it repeatedly instructed the jury regarding the limited purposes for which the evidence of the Morgan incident could be used. In light of the foregoing, we conclude that the trial court did not err by admitting evidence of the Morgan incident. Accordingly, Jacobs' second argument is overruled.

[4] Jacobs next argues that the trial court erred by allowing the State to question Parker and Brayboy regarding their prior inconsistent statements. Jacobs asserts that because Parker and Brayboy's trial testimony "minimized, if not exempted, [Jacobs] from participation in the crime[,]" the State should not have been allowed to refer to their custodial statements to law enforcement officers. We disagree.

N.C. Gen. Stat. § 8C-1, Rule 607 (2003) provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." Thus, "where the party calling a witness is genuinely surprised by the witness' change of his or her version of facts, impeachment by prior inconsistent statements is proper." *State v. Miller*, 330 N.C. 56, 62-63, 408 S.E.2d 846, 850 (1991) (citing *State v. Hunt*, 324 N.C. 343, 350, 378 S.E.2d 754, 758 (1989)). "Likewise, where there is testimony that a witness fails to remember having made cer-

tain parts of a prior statement, denies having made certain parts of a prior statement, or contends that certain parts of the prior statement are false, . . . the witness [may] be impeached with the prior inconsistent statement." *State v. Riccard*, 142 N.C. App. 298, 303, 542 S.E.2d 320, 323, *cert. denied*, 353 N.C. 530, 549 S.E.2d 864 (2001). "However, it is well settled that in such situations the prior inconsistent statements may only be used to impeach the witness' credibility; they may not be admitted as substantive evidence." *Miller*, 330 N.C. at 63, 408 S.E.2d at 850 (citing *Hunt*, 324 N.C. at 350, 378 S.E.2d at 758; *State v. Grady*, 73 N.C. App. 452, 456, 326 S.E.2d 126, 129 (1985); 1 Brandis on North Carolina Evidence § 46 (1988)).

In the instant case, both Parker and Brayboy testified on behalf of the State, and both initially testified in a manner inconsistent with their custodial statements to law enforcement officers. Although Parker and Brayboy both agreed to having made their custodial statements, neither could remember all parts of their custodial statement or whether it was completely accurate. Over Jacobs' objection, the trial court allowed Parker and Brayboy to review their statements and the State to impeach both witnesses by use of the statements. Jacobs contends that this was error, in that the trial court (i) failed to find that the State was surprised by the testimony and (ii) erred by admitting the evidence for substantive purposes. We cannot agree.

Our Supreme Court has previously held that

before granting the prosecutor's motion to treat his witness as hostile or unwilling and to cross-examine him, "the court must be satisfied that the State's attorney has been misled and surprised by the witness, whose testimony as to a material fact is contrary to what the State had a *right* to expect. . . . If the trial judge finds that the State should be allowed to offer prior inconsistent statements, his findings should also specify the extent to which such statements may be offered."

*State v. Lovette*, 299 N.C. 642, 648, 263 S.E.2d 751, 755-56 (1980) (citations omitted) (emphasis and alteration in original). However, these "technical requirements" were abolished by the adoption of N.C. Gen. Stat. § 8C-1, Rule 607. *See State v. Bell*, 87 N.C. App. 626, 633, 362 S.E.2d 288, 292 (1987) (citing *State v. Holsey*, 318 N.C. 330, 340, 348 S.E.2d 805, 811 (1986) (concluding that where the record on appeal "manifestly shows that the witness was only ostensibly the witness of the party calling her and was entirely friendly to the party cross-examining her, the trial court does not commit reversible error by

failing to make such a formal declaration. A trial court may properly limit leading questions of a witness in such situations without conducting a *voir dire* hearing or making any formal declaration.")).

In the instant case, the record clearly demonstrates that Parker and Brayboy were testifying contrary to the expectations of the State, and there is no indication that the State called the witnesses or used their impeachment "as a mere subterfuge to get evidence before the jury which was otherwise inadmissible." *Riccard*, 142 N.C. App. at 304, 542 S.E.2d at 324. Furthermore, we note that the trial court instructed the jury that "[w]hen evidence has been received tending to show that, at an earlier time, a witness made a statement which . . . may be consistent or may conflict with his testimony at this trial you must not consider such earlier statement as evidence of the truth of what was said at the earlier time . . . ." In light of the foregoing, we conclude that the trial court did not err either by allowing Parker and Brayboy to refresh their memory through their prior custodial statements or by allowing the State to impeach them through use of the statements. Accordingly, we overrule Jacobs' third argument.

[5] Jacobs next argues that the trial court erred by sustaining the State's objections to various questions asked of Morgan on cross-examination. Jacobs first asserts that the trial court erred by limiting his questions regarding Morgan's prior convictions for simple assault and probationary status. Jacobs also asserts that the trial court erred by limiting his questions regarding a transcript of plea Morgan signed prior to Jacobs' trial. While we note that the trial court has discretionary power regarding the limits of cross-examination aimed at impeaching a witness, we also note that "[t]he discretionary power of the trial judge is to confine the cross-examination within reasonable limits. It does not include the authority to exclude altogether questions, and the answers thereto, which directly challenge the disinterestedness or credibility of the witness' testimony." *State v. Roberson*, 215 N.C. 784, 787, 3 S.E.2d 277, 279-80 (1939). Nevertheless, assuming *arguendo* that the trial court erred by limiting Jacobs' cross-examination, we are not persuaded that Jacobs is entitled to a new trial. Morgan's testimony focused on his own kidnapping and robbery rather than those charges Jacobs faced at trial. Brayboy provided a similar account of the incident and detailed Jacobs' involvement in it during his testimony. Morgan's statement to Detective Carter was admitted into evidence along with his photographic identification of Brayboy and Jacobs. Defense counsel was

allowed to question Morgan regarding his current incarceration, his conviction for possession of a firearm on educational property, his conviction for possession of a firearm by a felon, his conviction for driving afer consuming an alcoholic beverage, his conviction for resisting a public officer, and his conviction for violating a domestic violence order. With respect to the plea transcript, although after examining the document the trial court concluded and instructed the jury that "[t]here is nothing in those papers, in writing . . . . requiring James Morgan to testify in this case[,]" the trial court instructed defense counsel that he was allowed to "ask [Morgan] if he got some consideration for his testimony here today[.]" In light of the foregoing, we conclude that Jacobs has failed to demonstrate that he was prejudiced by any error of the trial court. Accordingly, we overrule Jacobs' fourth argument.

**[6]** Jacobs next argues that the trial court erred by allowing Detective Strickland to read McMillian's custodial statement to the jury. Jacobs asserts that the statement was not properly redacted prior to its introduction. We disagree.

N.C. Gen. Stat. § 15A-927(c)(1) (2003) provides as follows:

When a defendant objects to joinder of charges against two or more defendants for trial because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court must require the prosecutor to select one of the following courses:

a. A joint trial at which the statement is not admitted into evidence; or

b. A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted so that the statement will not prejudice him; or

c. A separate trial of the objecting defendant.

In the instant case, the State sought to introduce McMillian's statement at trial in an effort to demonstrate McMillian's role in the Chavis incident. Prior to the statement being read by Detective Strickland, the parties and the trial court had extensive discussions regarding what portions of McMillian's statements should be redacted. The State initially sought to replace the references to Jacobs with the word "someone." However, after discussing the issue with defense counsel and the trial court, the State agreed to take out

all references to Jacobs by name. Detective Strickland thereafter read McMillian's statement in pertinent part as follows:

> I, Bruce Lee McMillian, want to make the following statement. On July the 29th, 2002, I got to the barn about 11:00 or 11:30 p.m. George Allen [Locklear] and myself rode to Jonesville and back around by Modes' old store. We followed Sharrone [Brayboy] and [William] Robert [Parker] because he did not have any turn signals on the old brown Caprice. I asked George where we were going, and he said, "Just follow them. We're fixing to get one." . . . I said, "What, you are not going to rob nobody, are you?" George said, "No, they are." We followed them what seemed like through half of Robeson County to get there. We turned around at a stop sign, and I knew where we were at. Then, I knew who they were going to rob. Sharrone and Robert pulled up in a man's yard. We went right past the house and parked on the dirt road where we could see the house. We probably sit on the dirt road about 5 minutes. We rode back to the stop sign and turned around. I stopped where they pulled out from. I got out of the car, walked to the house and told Sharrone, "Let's go." I did not have no police shirt on. I did not have a gun or nothing. I walked back out of the house and got into the car and was still waiting on Sharrone. Sharrone finally came out of the house and got in the car, and we left. When we were going down the road, Sharrone pulled out a lot of money and some dope in a clear, plastic bag. I think it was crystal meth. We went back to the barn. . . . I left and went to the other house in Laur[i]nburg and got everybody some food. We all ate and went to bed. That was it on that one.

On appeal, Jacobs contends that because "the redacted statement used the pronoun 'we' as a place holder for the defendant, the admission of the Statement violated [Jacobs'] Constitutional right to confront witnesses." We recognize that our courts have previously held that "the introduction of a nontestifying defendant's confession that does not mention a codefendant could implicate the codefendant and violate [his rights] if it is clear that the confession is referring to the codefendant." *State v. Littlejohn*, 340 N.C. 750, 755, 459 S.E.2d 629, 632 (1995) (citing *State v. Hayes*, 314 N.C. 460, 334 S.E.2d 741 (1985) and *State v. Gonzalez*, 311 N.C. 80, 316 S.E.2d 229 (1984)); *see Bruton v. United States*, 391 U.S. 123, 126, 20 L. Ed. 2d 476, 479 (1968) (holding that the defendant's confrontation rights were violated by the admission into evidence of a nontestifying co-defendant's confession which was "powerfully incriminating" in that it implicated the defend-

ant in the crime and thus created a "substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [the defendant's] guilt[.]"). However, in the instant case, we are not persuaded that the use of the word "we" in McMillian's redacted statement clearly implicated Jacobs. As detailed above, the word followed and was included in sentences which discussed the location and activity of several individuals, most often McMillian, Brayboy, and Locklear. The statement was read after careful redaction by the State and contains no obvious deletions or breaks. In light of the foregoing, we conclude that McMillian's statement does not clearly identify Jacobs or otherwise contain those "powerfully incriminating" characteristics requiring reversal under the Confrontation Clause. Accordingly, we overrule Jacobs' fifth argument.

### III. Sentencing and Attorney's Fees

[7] Jacobs' sixth argument is that the trial court erred by sentencing him in the aggravated range. Jacobs asserts that the trial court was prohibited from sentencing him in the aggravated range without first submitting the aggravating factors to the jury for proof beyond a reasonable doubt. We agree.

In *State v. Allen*, 359 N.C. 425, 615 S.E.2d 256 (2005), our Supreme Court recently reviewed North Carolina's structured sentencing scheme in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). After reviewing the pertinent case law, the Court determined that, when "[a]pplied to North Carolina's structured sentencing scheme, the rule of *Apprendi* and *Blakely* is: Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed presumptive range must be submitted to a jury and proved beyond a reasonable doubt." *Allen*, 359 N.C. at 437, 615 S.E.2d at 265 (citing *Blakely*, 542 U.S. at ——, 159 L. Ed. 2d at 413-14; *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455; N.C. Gen. Stat. §§ 15A-1340.13, 15A-1340.14, 15A-1340.16, 15A-1340.17). The Court noted that its holding "appl[ied] to cases 'in which the defendants have not yet been indicted as of the certification date of this opinion and to cases that are now pending on direct review or are not yet final[,]" thereby making it applicable to the instant case. 359 N.C. at 427, 615 S.E.2d at 258 (quoting *State v. Lucas*, 353 N.C. 568, 598, 548 S.E.2d 712, 732 (2001)); *see also* N.C. Gen. Stat. § 15A-1446(d)(19).

Here, as aggravating factors to Jacobs' convictions, the trial court found that Jacobs (i) induced others to participate in the commission of the offenses, (ii) joined with more than one other person in committing the offenses and was not charged with conspiracy, (iii) took advantage of a position of trust or confidence to commit the offenses, and (iv) committed the offenses against physically infirm victims. The trial court found these factors unilaterally, thereby violating the Court's decision in *Allen* and the cases cited therein. The State contends that this error was nevertheless harmless, in that it introduced uncontroverted and overwhelming evidence to establish the existence of the aggravating factors. However, "[b]ecause 'speculat[ion] on what juries would have done if they had been asked to find different facts' is impermissible," the Court concluded in *Allen* that " '[h]armless error analysis cannot be conducted on *Blakely* Sixth Amendment violations.' " 359 N.C. at 448, 615 S.E.2d at 271-72 (quoting *State v. Hughes*, 154 Wash. 2d 118, 148, 110 P.3d 192, 208 (2005)). Therefore, in light of the Court's decision in *Allen*, we conclude that the trial court committed reversible error by aggravating Jacobs' sentences in the instant case. Accordingly, we remand the case to the trial court for resentencing.

[8] Jacobs' final argument is that the trial court erred by imposing attorney's fees upon him. Jacobs asserts that he was not provided with sufficient notice of or an opportunity to be heard concerning the fees of his court-appointed attorney. We agree.

N.C. Gen. Stat. § 7A-455 (2003) provides that the trial court may enter a civil judgment against a convicted indigent defendant for the amount of fees incurred by the defendant's court-appointed attorney. In *State v. Crews*, 284 N.C. 427, 201 S.E.2d 840 (1974), the trial court entered a judgment imposing fees upon the defendant for his attorney's services. On appeal, our Supreme Court noted that the record was unclear regarding whether the judgment was entered against the defendant without notice or opportunity for him to be heard. Accordingly, the Court vacated the judgment "without prejudice to the State's right to apply for a judgment in accordance with G.S. 7A-455 after due notice to [the] defendant and a hearing[.]" *Id.* at 442, 201 S.E.2d at 849-50. Similarly, in *State v. Stafford*, 45 N.C. App. 297, 300, 262 S.E.2d 695, 697 (1980), this Court vacated a civil judgment imposing attorney's fees on an indigent defendant where there was "no indication [in the record] that [the] defendant received any opportunity to be heard on the matter" of attorney's fees. In *State v. Jacobs*, 172 N.C. App. 220, 235, 616 S.E.2d 306, 316 (2005), this Court

vacated the trial court's award of attorney's fees where, although the issue was discussed following the defendant's conviction, "there [wa]s no indication in the record that [the] defendant was notified of and given an opportunity to be heard regarding the appointed attorney's total hours or the total amount of fees imposed."

In the instant case, following the imposition of Jacobs' sentence, the trial court stated in pertinent part as follows:

> As to both defendants, they shall be ordered to pay cost[s], and judgments will be placed against them for both the cost[s] and attorneys' fees. . . . Gentlemen, you calculate your hours and submit that to me. A judgment will be placed against your individual clients for those amounts.

The trial court's statement demonstrates that Jacobs was given notice of the trial court's intention to impose attorney's fees upon him. However, while the transcript reveals that attorney's fees were discussed following his conviction, there is no indication that Jacobs was notified of and given an opportunity to be heard regarding his appointed attorney's total hours or the total amount of fees imposed. Therefore, in light of the foregoing, we vacate the trial court's imposition of attorney's fees in this matter. On remand, the State may apply for a judgment in accordance with N.C. Gen. Stat. § 7A-455, provided that Jacobs is given notice and an opportunity to be heard regarding the total amount of hours and fees claimed by his attorney.

### McMillian's Appeal

The issues in McMillian's appeal are whether the trial court erred by: (I) failing to cure an alleged improper remark made during the State's closing argument; (II) allowing the State to introduce a redacted version of Jacobs' custodial statement; (III) failing to grant McMillian's motion to sever the trial; and (IV) instructing the jury regarding second-degree kidnapping.

### I. State's Closing Argument

[9] McMillian first argues that the trial court erred by failing to properly cure a remark made by the Assistant District Attorney during the State's closing argument. The trial transcript contains the following pertinent exchange:

> THE STATE: In Bruce's case, Bruce actually went inside the Chavises' house, when they were—if you recall, this is from him-

self—now, remember, the State must prove all the evidence. The State must provide it all. The State presents it all. In this case, the State didn't present it all. However, we did hear from the defendants. They made statements.

JACOBS' COUNSEL: Objection, Your Honor—

THE COURT: Overruled.

THE STATE: Their statements—

JACOBS' COUNSEL: Your Honor, may I be heard?

THE COURT: Approach the bench please.

. . . .

[The sidebar conference was conducted as follows out of the hearing of the jurors.]

JACOBS' COUNSEL: Your Honor, [the Assistant District Attorney] said that the jury had not heard from the defendants. By saying that, he commented—and has commented on the defendants not testifying. I think that's reversible error, calls for a mistrial.

THE STATE: If you'll let me finish what I was saying, I'm very clear on what I'm saying.

THE COURT: I think I probably need to instruct them. Let me instruct them. Your motion for a mistrial is denied, however.

. . . .

THE STATE: May I note, if I could at least finish the sentence I'm saying—and I started saying it—that they made statements, recorded, put in writing and signed by them, which were presented into evidence. That's all true.

. . . .

[The parties to the sidebar conference resumed their respective places in the courtroom.]

THE COURT: Members of the jury, let me instruct you as follows regarding [the Assistant District Attorney's] argument. There's some suggestion that you had not heard from the defendants. Let me again remind you the defendants are under no obligation, absolutely no obligation to offer testimony or to testify them-

STATE v. JACOBS

[174 N.C. App. 1 (2005)]

selves in this case. That is true in this case as well as any case, any criminal case. The defendant cannot be compelled to testify. He has an absolute right to testify, and no mention should be made of his failure to testify. You may continue.

THE STATE: In Exhibits 35 and 36, we have the statements made, respectively, by Curl[e]y Jacobs and Bruce Lee McMillian. . . .

While he concedes that he did not object during the State's closing argument or following the trial court's instruction, McMillian asserts that the trial court committed plain error by failing to grant a mistrial following the statement and by improperly instructing the jury. Although we note that our courts have limited plain error review only to those errors in a trial court's jury instructions or rulings on admissibility of evidence, *see, e.g., State v. Golphin*, 352 N.C. 364, 460, 533 S.E.2d 168, 230-31 (2000), to the extent McMillian has failed to preserve this argument, we have chosen to review it pursuant to the discretion granted us by N.C.R. App. P. 2.

Both the federal Constitution and our state's statutes prohibit the prosecution from commenting on a defendant's failure to testify at trial. *See Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110 (1965) ("We take that in its literal sense and hold that the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.") (citations omitted) and N.C. Gen. Stat. § 8-54 (2003) ("In the trial of all indictments, complaints, or other proceedings against persons charged with the commission of crimes, offenses or misdemeanors, the person so charged is, at his own request, but not otherwise, a competent witness, and his failure to make such request shall not create any presumption against him."). However, these rules are not meant "to restrict the prosecutor from making . . . comments upon the evidence and drawing . . . deductions therefrom . . . ." *State v. Richardson*, 342 N.C. 772, 786-87, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996).

In the instant case, we are not persuaded that the Assistant District Attorney's closing argument commented on McMillian's failure to testify. As he noted at trial, in submitting that the jury "did hear from the defendants" and that "[t]hey made statements[,]" the Assistant District Attorney was referring to the statements made by defendants following their arrest, not their failure to testify at trial. In

*State v. Hooker*, 145 N.C. 581, 59 S.E. 866 (1907), the defendant objected to the prosecution's closing argument statement that "none of the evidence as testified to by the State's witnesses had been contradicted, and no one had said that it was not true." On appeal, our Supreme Court concluded that "[t]his could not be taken as a criticism upon the failure of the defendant to put himself upon the stand[,]" and it noted that the trial court, "out of abundant caution," thereafter informed the jury that "the fact that the defendant did not go upon the stand could not be considered by the jury to his prejudice, and that, if they had understood the Solicitor as meaning to comment on that fact, they should disregard it[.]" *Id.* at 584-85, 59 S.E. at 867. In the instant case, we are similarly unconvinced that the Assistant District Attorney's comments could be taken as a criticism of McMillian's decision not to testify. Furthermore, we note that after overruling Jacobs' objection, the trial court explained to the jury that both defendants were under no obligation to testify during their trial. In light of the foregoing, we conclude that the trial court did not err either by refusing to grant a mistrial or by instructing the jury regarding the Assistant District Attorney's comments. Accordingly, we overrule McMillian's first argument.

## II. Evidentiary Issues

**[10]** McMillian next argues that the trial court erred by admitting Jacobs' custodial statement into evidence. McMillian asserts that the statement was inadmissible because it was improperly redacted and implicated him in the incident. We note initially that, despite his failure to provide any argument supporting the contention that the trial court committed plain error, McMillian requests that this Court examine his argument under plain error analysis. "The right and requirement to specifically and distinctly contend an error amounts to plain error does not obviate the requirement that a party provide argument supporting the contention" that the trial court's actions amounted to plain error. *State v. Cummings*, 352 N.C. 600, 636, 536 S.E.2d 36, 61 (2000), *cert. denied*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). "By simply relying on the use of the words 'plain error' as the extent of his argument in support of plain error, [Jacobs] has effectively failed to argue plain error and has thereby waived appellate review." *Id.* at 637, 536 S.E.2d at 61. Nevertheless, in our discretion pursuant to N.C.R. App. P. 2, we have chosen to review McMillian's argument and, as detailed below, we conclude that he has failed to show prejudice resulting from the introduction of the statement.

STATE v. JACOBS

[174 N.C. App. 1 (2005)]

The record reflects that following a conference between the State, defense counsel, and the trial court, Detective Strickland read to the jury the following redacted version of Jacobs' custodial statement:

On Saturday and Sunday, July 27th and 28th, 2002, I had been talking to Cricket, who is William Parker, and Sharrone Brayboy. Cricket had been wanting to make a lick. The white boy, William Parker, said "What about Lee Otis [Chavis], the man you know?" I said, "Who, Lee Otis?" He said, "Yes, the crank man." I told him them was old people; if anything went down, to be real gentle with him because he had by-pass surgery. The white boy said, "Don't you know where everything is? Just tell me where it's at, and I will get it." He was talking about the money and the dope and scales. Monday night, George Allen [Locklear] came to the house and picked me up in a green Cavalier. When I got to the barn, the white boy and Sharrone were already dressed with police shirts. The white boy, William Parker, said, "We are ready, but we don't know how to get there." I drove the brown Caprice . . . by the house and pointed it out to the white boy and Sharrone. George Allen were following us in a green Cavalier. The green one was sitting at the barn when they come and picked us up. We went on past the house to the stop sign. We went straight across for about 2 miles and pulled off the shoulder of the road. I got in the car with George Allen, and we rode back by the house and parked on the dirt road so we could watch Lee Otis' house. We had told them to turn the porch light off when everything was all right. We kept sitting and waiting and waiting, and they never came out. We pulled in front of the house and the white boy came out. I could hear Cricket telling someone that, "Sharrone won't come out of the house." Someone went in the house and told Sharrone to, "Let's go." We left the house and stopped about 4 or 5 miles down the road and put licensed drivers under the steering wheel. I got in the Caprice and started driving it. We went back to the barn. I don't want to go any further at this point due to the fact of being charged with conspiracy for being tied into this case. There was two or three of us that got licked because Sharrone . . . held out with the money or it was him or the white boy. Their figures did not add up.

On appeal, McMillian contends that the replacement of his name with the word "someone" implicated him in the incident and thus violated his Confrontation Clause rights. However, we note that

The mere finding of a violation of the *Bruton* rule in the course of the trial . . . does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

*Schneble v. Florida*, 405 U.S. 427, 430, 31 L. Ed. 2d 340, 344 (1972); *Hayes*, 314 N.C. at 470, 334 S.E.2d at 747. In the instant case, assuming *arguendo* that it was improper for the trial court to allow Detective Strickland to read the redacted version of Jacobs' statement, we are not convinced McMillian is entitled to a new trial. The State presented overwhelming evidence to establish McMillian's guilt notwithstanding Jacobs' statement, including testimony from Mrs. Chavis and Brayboy which tended to show that McMillian entered the Chavis residence during the incident and was referred to by the name "Sarge." As detailed above, McMillian's own statement to law enforcement officers describes his involvement in the incident, including his "g[etting] out of the car, walk[ing] to the house and t[elling] Sharrone, 'Let's go.' " In light of the foregoing, we conclude that any error related to the introduction of Jacobs' statement was harmless. Accordingly, we overrule McMillian's second argument.

### III. Motion to Sever

[11] McMillian next argues that the trial court erred by failing to grant his motion to sever the trial. McMillian asserts that the trial court should have severed the trial because it was "but a simple leap" for the jury to believe that he was involved in the Morgan incident. We disagree.

Where the State charges two defendants for the same crime or crimes, "public policy strongly compels consolidation as the rule rather than the exception." *State v. Nelson*, 298 N.C. 573, 586, 260 S.E.2d 629, 639 (1979), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980). "The question of whether defendants should be tried jointly or separately is within the sound discretion of the trial judge, and the trial judge's ruling will not be disturbed on appeal absent a showing that joinder has deprived a defendant of a fair trial." *State v. Evans*, 346 N.C. 221, 232, 485 S.E.2d 271, 277 (1997), *cert. denied*, 522 U.S. 1057, 139 L. Ed. 2d 653 (1998).

In the instant case, despite his express acknowledgment in his brief that "[a]ccording to the evidence, [he] did not have anything to

do with the incident involving the shooting" of Morgan, McMillian contends that the introduction of evidence concerning the Morgan incident deprived him of a fair trial. However, after reviewing the record in its entirety, we are not convinced that the trial court abused its discretion by denying McMillian's motion to sever the trial. McMillian was not identified as a participant in any stage of the Morgan incident, and the trial court twice instructed the jury regarding the limited use of the evidence, including that it was limited to "the defendant Curl[e]y Jacobs" and "received solely for the purpose of showing that he was aware—that is, he, Curl[e]y Jacobs—was aware of a common plan, scheme, or design involved in the charge or the crime in the present case . . . ." "If we were convinced that juries were unable to separately evaluate the guilt or innocence of defendants tried jointly because of a tendency to determine guilt by association at trial, we would never uphold joint trials of criminal defendants." *State v. Lowery*, 318 N.C. 54, 61, 347 S.E.2d 729, 735 (1986). In the instant case, because evidence of the Morgan incident in no way implicated McMillian and was clearly admitted for limited purposes, we conclude that the trial court did not err by denying McMillian's motion to sever the trial. Accordingly, McMillian's third argument is overruled.

### IV. Jury Instructions

**[12]** McMillian's final argument is that the trial court erred by instructing the jury regarding the second-degree kidnapping charges. McMillian asserts that it was plain error for the trial court to instruct the jury that it may convict McMillian for second-degree kidnapping if it found that the victims were restrained "for the purpose of commission of burglary and armed robbery[,]" in that the indictments of the kidnapping offenses alleged that the victims were restrained "for the purpose of facilitating the commission of a felony, robbery[.]" We disagree.

"It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977) (citations omitted); *State v. Tirado*, 358 N.C. 551, 574, 599 S.E.2d 515, 532 (2004), *cert. denied*, —— U.S. ——, 161 L. Ed. 2d 285 (2005). "Under [plain error] analysis, defendants must show that [jury] instructions were erroneous and that absent the erroneous instructions, a jury probably would have returned a different verdict." *Tirado*, 358 N.C. at 574, 599 S.E.2d at 531 (citing N.C. Gen. Stat. § 15A-1443(a) (2003)). Thus, to prevail under plain error in the

instant case, McMillian must demonstrate that the trial court's alleged error was "so fundamental that it denied [him] a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993).

In *Tirado*, our Supreme Court noted that

> Error arises when a trial judge permits a jury to convict upon an abstract theory not supported by the bill of indictment. *State v. Taylor*, 301 N.C. 164, 170, 270 S.E.2d 409, 413 (1980). This Court has held such error to be prejudicial when the trial court's instruction as to the defendant's underlying intent or purpose in committing a kidnapping differs from that alleged in the indictment. *See State v. Brown*, 312 N.C. 237, 249, 321 S.E.2d 856, 863 (1984) (holding that when the trial court charged the jury on an additional purpose for kidnapping not listed in the indictment and the State presented no evidence on such theory, the jury instructions constituted plain error); *see also State v. Taylor*, 301 N.C. at 171, 270 S.E.2d at 413-14 (holding that complete failure to instruct the jury on the theory charged in the bill of indictment together with instructions based on theories not charged in the indictment constituted prejudicial error); *State v. Dammons*, 293 N.C. 263, 272, 237 S.E.2d 834, 841 (1977) (holding that where theories of the crime were "neither supported by the evidence nor charged in the bill of indictment," the instructions constituted prejudicial error). However, we have also found no plain error where the trial court's instruction included the purpose that was listed in the indictment and where compelling evidence had been presented to support an additional element or elements not included in the indictment as to which the court had nevertheless instructed. *State v. Lucas*, 353 N.C. 568, 588, 548 S.E.2d 712, 726 (2001).

358 N.C. at 574-75, 599 S.E.2d at 532.

In the instant case, the indictments for second-degree kidnapping asserted that the Chavises were restrained "for the purpose of facilitating the commission of a felony, robbery[.]" However, at trial, the trial court instructed the jury that it may convict McMillian if it found that the restraint was "for the purpose of commission of burglary and armed robbery." Following this instruction, the trial court informed the jury of the elements of first-degree burglary and armed robbery, crimes for which McMillian was also indicted and convicted. Assuming *arguendo* that the trial court erred by instructing the jury

regarding the additional felony, after examining the record and the instructions in their entirety, we are not persuaded that the alleged error was "a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *Id.* at 576, 599 S.E.2d at 532 (quotations and citations omitted). Instead, we note that the trial court's instruction actually *added* a second crime to the purpose of the restraint, thereby placing a *higher* burden of proof on the State. Furthermore, compelling evidence supported the additional theory submitted by the trial court, and the jury found McMillian guilty of the crime giving rise to it. In light of the foregoing, we are unable to conclude that a different result would have been reached had the trial court instructed the jury only on the theory alleged in the State's indictment. Accordingly, we overrule McMillian's final argument.

### *Conclusion*

In light of the foregoing, we hold that both defendants received a trial free of prejudicial error. However, because the trial court failed to submit aggravating factors to the jury and failed to provide Jacobs with proper notice regarding the imposition of attorney's fees, we vacate and remand Jacobs' case in part. On remand, the trial court may engage in any proceedings necessary to comply with the instructions detailed above.

As to Jacob's Appeal: No error in part; vacated and remanded in part.

As to McMillian's Appeal: No error.

Judge BRYANT concurs.

Judge LEVINSON concurs in part and dissents in part in a separate opinion.

LEVINSON, Judge concurring in part and dissenting in part.

I concur in the majority opinion except to the extent it vacates those portions of the judgments which purportedly impose attorney fees against Jacobs. The majority reasons that, because Jacobs did not have an opportunity to be heard concerning the number of attorney hours or the total fee, he is entitled to another hearing. This is, in my view, erroneous for two reasons.

First, there has been no appeal from, and the record is completely devoid of, any judgments or orders which require Jacobs to pay attorney fees. The criminal judgments on appeal only provide, "[a] civil judgment is to be placed against defendant for attorney fees." As there is *nothing* in the record on appeal to suggest what, if anything, the court ever entered on attorney fees, there is likewise *nothing* for this Court to address. The majority opinion attempts to vacate, in part, an order that may never have been entered; may have actually been entered only after some subsequent notice and hearing; and may require defendant to pay $0. We cannot know because such an order is not before this Court.

Secondly, the trial court has only indicated its intention to enter a subsequent order. In this regard, the trial court did exactly that which our appellate precedent requires: it declined to enter a civil judgment against defendant for an amount certain *until some later time* when he would have an opportunity to be heard.