STATE OF NORTH CAROLINA v. DARRYL OBELIN MURPHY

No. 402A94

(Filed 8 March 1996)

**1. Criminal Law § 621 (NCI4th)— motion to dismiss—circumstantial evidence—sufficient**

The trial court did not err in a prosecution for first-degree murder, felonious breaking or entering, felonious larceny, felonious auto larceny and robbery with a dangerous weapon by denying defendant's motion to dismiss all of the charges for insufficient evidence where defendant contended that the State's case tying defendant to the offenses was built on innuendo and speculation, but the evidence, viewed in the light most favorable to the State, clearly supports a reasonable inference that defendant was the perpetrator.

**Am Jur 2d, Evidence §§ 1467 et seq.**

**2. Appeal and Error § 150 (NCI4th)— right to remain silent— implicitly presented to trial court—appealability**

The issue of whether a first-degree murder defendant's statement should have been suppressed because his right to remain

silent was violated was properly before the Supreme Court where the State argued that the issue was not presented to the trial court, but the contention was implicit in defendant's argument to the trial court that the SBI agent would not have been required to readvise defendant of his rights unless the defendant had invoked his right to remain silent.

**Am Jur 2d, Appellate Review §§ 727 et seq.**

**Necessity and sufficiency of statements informing one under investigation for involuntary commitment of right to remain silent. 23 ALR4th 563.**

3. **Evidence and Witnesses § 1259 (NCI4th)— right to remain silent —invocation—sufficient**

A defendant in a prosecution for first-degree murder, felonious breaking or entering, felonious larceny, felonious auto larceny and robbery with a dangerous weapon invoked his right to silence where the defendant's conduct in abruptly standing up, combined with his unambiguous statement, "I got nothing to say," were clear indicators that he wished to terminate the interrogation and invoke his right to remain silent; defendant had similarly indicated a desire to end two prior interrogations by standing up; and the fact that the officers immediately ceased the interrogation and took the defendant to be "booked" makes it equally clear that the officers understood that defendant was terminating the interrogation and invoking his right to remain silent.

**Am Jur 2d, Criminal Law §§ 788 et seq; §§ 749, 750.**

**Necessity and sufficiency of statements informing one under investigation for involuntary commitment of right to remain silent. 23 ALR4th 563.**

4. **Evidence and Witnesses § 1248 (NCI4th); Constitutional Law § 352 (NCI4th)— right to silence invoked—interrogation reinitated by police within 15 minutes—right to silence violated**

The trial court erred in a prosecution for first-degree murder, felonious breaking or entering, felonious larceny, felonious auto larceny and robbery with a dangerous weapon where defendant invoked his right to silence; the interrogation was terminated; defendant was charged; and an SBI agent initiated a conversation with defendant during processing less than fifteen minutes after the initial interrogation ended for the purpose of determining

**STATE v. MURPHY**

[342 N.C. 813 (1996)]

whether defendant had killed the victim and without readvising defendant of his *Miranda* rights. A *per se* rule requiring mandatory rewarning places form over substance and does not adequately emphasize the substantive conduct required by law enforcement officers after an accused has asserted his right to remain silent; where, as here, the police ceased the interrogation but then resumed within fifteen minutes of the time the defendant invoked his right to remain silent, the second interrogation involved the same subject matter as the earlier interrogation, and the defendant was not readvised of his *Miranda* rights, the defendant's right to cut off questioning was not scrupulously honored and his Fifth Amendment right to silence was violated.

**Am Jur 2d, Criminal Law §§ 788 et seq; §§ 749, 750.**

**Necessity and sufficiency of statements informing one under investigation for involuntary commitment of right to remain silent. 23 ALR4th 563.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Strickland, J., at the 25 October 1993 Special Criminal Session of Superior Court, Pender County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for felonious breaking and entering, felonious larceny, felonious auto larceny and robbery with a dangerous weapon was allowed 19 December 1994. Heard in the Supreme Court 13 November 1995.

*Michael F. Easley, Attorney General, by Gail E. Weis, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Charlesena Elliott Walker, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 24 August 1992 for the first-degree murder of Thomas Herring. Defendant was subsequently indicted on 4 January 1993 for felonious breaking and entering, felonious larceny, felonious auto larceny and robbery with a dangerous weapon in connection with the same incident. The defendant was tried capitally, and the jury found the defendant guilty of first-degree murder on the theory of premeditation and deliberation. The jury also returned verdicts

of guilty on each of the additional charges. Following a capital sentencing hearing, the jury recommended a sentence of life imprisonment for the murder conviction. Judge Strickland sentenced the defendant to consecutive terms of life imprisonment for the murder, forty years' imprisonment for the robbery with a dangerous weapon and ten years' imprisonment for each of the remaining felonies.

At trial, the State presented evidence tending to show that on 7 August 1992, the defendant worked at the Gold Banner Meat Processing Plant (Gold Banner) as the night clean-up person. The defendant normally worked from 4:00 p.m. to 4:00 a.m. Monday through Saturday. Thomas Herring, the seventy-nine-year-old victim, also worked at Gold Banner as the night security guard. Herring worked from 11:30 p.m. to 6:00 a.m. on Fridays, Saturdays and Sundays. Herring made hourly rounds and recorded what occurred in a ledger. Between rounds, Herring often napped in the reception area. The reception area door was usually left unlocked because there was a problem with the lock and because the plant was surrounded by a ten-foot-high chain-link fence that was topped with barbed wire. The fence had two gates which were always locked at night.

On 7 August 1992, Gene Horne, another night-shift employee, witnessed the defendant leave the plant by sliding underneath one of the gates in the chain-link fence. Horne later saw the defendant return to work in the same manner. After the defendant's return, Horne noticed that the door to the ladies' rest room, which was normally open, was closed. Horne pushed open the door and saw the defendant squatting down in front of a bench crushing something which the defendant said was aspirin. Horne informed Herring what he had observed. Horne and Herring noticed that the defendant was missing and once again found the defendant in the ladies' rest room crushing something. Later that night, Herring found the defendant, on his knees, in a stall in the ladies' rest room. When asked what he was doing, the defendant replied that he was praying. Due to the defendant's unusual behavior, Gene Horne called the plant manager, Charles McCarty, and told him that he thought the defendant "was on something."

When Charles McCarty arrived at the plant, he approached the defendant and noticed that the defendant's eyes were dilated and that his speech was slurred. McCarty asked the defendant what happened in the rest room, and the defendant said he had a toothache. McCarty asked the defendant to go to the hospital and give a urine sample, but the defendant vehemently protested, "You can't make me go."

Moments later, however, the defendant insisted they go immediately. McCarty then informed the defendant that he was fired. Thomas Herring was asked to escort the defendant off the premises. The defendant protested his termination but was told that the decision was final. The defendant then walked toward the door, but before leaving, he turned toward McCarty and Herring and said, "I'll see you later!"

Herring followed the defendant out of the plant and observed him leaving. After returning to the plant, Herring immediately said, "I think I'll bring my son with me tomorrow night." Herring was scheduled to work alone the following night. Herring's wife testified that before Herring left for work on Saturday, 8 August 1992, she saw him put a gun in his jacket pocket and take it to work with him. Herring's wife further testified that before this instance, her husband had never taken a gun with him to work. Charles McCarty testified that it was company policy that no firearms were allowed on the premises. McCarty further testified that he had never before seen Herring with a gun while he was working.

At approximately 9:00 a.m. on Sunday, 9 August 1992, Darryl Coleman drove by Gold Banner to check on the plant. Coleman noticed that the gate was open but that there were no cars in the parking lot. Coleman decided to check on the various pieces of equipment located inside the plant and in the process, discovered Thomas Herring's body lying in a pool of blood. A search of the plant revealed that nothing was missing except the victim's truck, keys and wallet. The victim's truck was later found abandoned in Wilmington, North Carolina, in a high crime and drug area. A can of Olde English beer was found in the bed of the truck.

Namon Murphy, the defendant's father, testified that the defendant lived at home and that their home was about a fifteen-minute walk from Gold Banner. Murphy further testified that he received a call from the defendant at approximately 5:45 a.m. on Sunday, 9 August 1992. The defendant wanted his father to drive to Wilmington to pick him up. Murphy then drove to Wilmington to pick up the defendant. A few hours after returning home, two sheriff's deputies came to talk to the defendant.

The defendant was subsequently questioned by Special Agent Bruce Kennedy of the State Bureau of Investigation regarding his activities on the night of the murder. The defendant stated that he stayed close to home most of the evening. Sometime after midnight

on the night of the murder, the defendant went to a Scotchman con-
venience store, located two blocks from Gold Banner, to get a snack.
While there, the defendant asked a man named "Norman," whom he
did not know, to give him a ride to Wilmington. According to the
defendant, Norman drove him to Wilmington in a blue Celebrity auto-
mobile. The defendant stated that after arriving in Wilmington, he
bought and smoked crack cocaine and then called home and asked
his father to pick him up. When Agent Kennedy said that he would
interview the Scotchman clerk, the defendant became uncertain
about whether the clerk would have seen Norman.

Agent Kennedy checked phone records and determined that the
phone call from the defendant to Namon Murphy was made from a
phone booth located seven blocks from the location where the vic-
tim's truck was found. Agent Kennedy also discovered that two phone
calls were made from the Murphy residence to a telephone sex line in
California at 1:45 a.m. and 2:28 a.m. on 9 August 1992. Namon Murphy
denied that he or his wife made those calls.

Michael Pounds, the night manager of the Scotchman conven-
ience store, knew the defendant as a regular customer in his store.
Pounds testified that on the night of the murder, the defendant came
into the store with two other men, purchased an Olde English beer
and then left with the same two men. Pounds testified that he never
saw the defendant with anyone who drove a blue Celebrity
automobile.

On 19 August 1992, Special Agents Anthony Cummings and Kelly
Moser of the State Bureau of Investigation spoke with the defendant.
The defendant was advised of his *Miranda* rights and waived those
rights. Defendant admitted that on the night he was fired, he left Gold
Banner by crawling under the security fence, bought some beer,
crawled back under the fence and brought the beer into the plant.
When asked why he left that way, the defendant stated, "Hell, man,
that's the way an old con does it. You see, man, I'm an old B and E
man, you know. I break and enter and steal." Agent Cummings
informed the defendant that the State Bureau of Investigation was
ready to charge him with Thomas Herring's murder, to which the
defendant responded, "Don't know nothing about the crime, man."
Agent Cummings also told the defendant that the one thing that had
remained constant throughout the investigation was the fact that the
defendant never did deny killing the victim. Defendant again stated
that he knew nothing about the crime. Agent Moser told the defend-

STATE v. MURPHY

[342 N.C. 813 (1996)]

ant that he would be glad to stay and talk about the murder, but the defendant stood up and said, "I got nothing to say, man."

The defendant was charged with the victim's murder and was sent for processing. While processing the defendant, Agent Kennedy initiated a conversation with the defendant for the purpose of determining whether the defendant had killed Mr. Herring. Agent Kennedy encouraged the defendant to "tell the truth," stating that the bad feeling in defendant's stomach would not go away until he did. Agent Kennedy testified that in response to his urging, the defendant replied, "Man, you know the position I'm in, I can't tell you about it."

[1] In his first assignment of error, the defendant contends that the trial court erred by denying his motion to dismiss all of the charges at the close of the State's evidence because the State did not present sufficient evidence that the defendant was the perpetrator of the offenses. Specifically, the defendant argues that there was no evidence to tie the defendant to the commission of the offenses and that the State's case was based on innuendo and speculation.

When a defendant moves for dismissal, the trial court must determine whether the State has presented substantial evidence of each essential element of the offense charged and substantial evidence that the defendant is the perpetrator. *State v. Olson*, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992). If substantial evidence of each element is presented, the motion for dismissal is properly denied. "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.*

In ruling on the motion to dismiss, the trial court must view all of the evidence, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor. *State v. McCullers*, 341 N.C. 19, 28-29, 460 S.E.2d 163, 168 (1995). The trial court need not concern itself with the weight of the evidence. In reviewing the sufficiency of the evidence, the question for the trial court is whether there is "any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990). If so, it is for the jurors to decide whether the facts satisfy them beyond a reasonable doubt that the defendant is actually guilty. *Id.* at 171-72, 393 S.E.2d at 787.

In this case, the defendant does not contest that a murder, armed robbery, breaking and entering, larceny and auto larceny were committed. Defendant does, however, contest the sufficiency of the evidence to show that he was the perpetrator of these crimes. After thoroughly reviewing the record, we are of the opinion that substantial circumstantial evidence exists which clearly supports a reasonable inference of the defendant's guilt.

The evidence shows that the defendant had access to the Gold Banner plant the night the victim was killed. His parents' home was a short walk from the plant. Defendant was home watching television with his mother until after midnight. At 1:45 a.m. and 2:28 a.m., phone calls were made to a telephone sex line from the Murphy home. Defendant's father denied that either he or his wife made those calls. It is reasonable to conclude, therefore, that the defendant was at his home until the last phone call was placed. At 3:20 a.m., the victim made the last entry in his journal. The defendant, according to his own statement, was out at that time of night and looking for a ride to Wilmington. Defendant claims to have met a man named "Norman" at the Scotchman who drove him to Wilmington in a blue Celebrity automobile. However, the clerk at the Scotchman did not see Norman or a blue Celebrity on the night of the murder.

The defendant, who by his own word was "an old B and E man," was aware that he could sneak in and out of the Gold Banner plant by sliding under a certain spot in the fence. The defendant was also aware that the victim would be working alone on the night he was killed. It is reasonable to infer that the defendant was aware that the front door to the plant had a damaged lock and was left unlocked at night, since he was one of the employees who worked at night. Furthermore, the nature of the defendant's job gave him knowledge and access to meat coats, aprons, rubber gloves, rubber sleeves and boots, all of which would protect him from leaving the plant with evidence of his presence at Gold Banner and could explain the absence of blood on defendant's clothing.

Nothing in the Gold Banner plant, other than the victim's wallet, keys and truck, was found to be damaged or missing. It is reasonable to infer that the sole target of the intruder was Thomas Herring. The defendant had a motive to kill Herring. The victim was one of the persons who reported the defendant's unusual behavior to the plant manager, Charles McCarty. McCarty arrived at the plant and fired the defendant. After his termination, McCarty and the victim were stand-

ing together when the defendant threatened, "I'll see you later!" Based on this evidence, it is reasonable to assume that the defendant viewed the victim as the cause of his termination.

It is also reasonable to infer that the defendant, after killing the victim, stole the victim's truck and drove it to Wilmington. The defendant went to Wilmington in the middle of the night and claimed to have traveled there in a car that no one saw and with people who could not be found or named. Although the defendant told law enforcement officers that he had purchased crack cocaine locally the night of the killing, he went to Wilmington late at night to purchase more drugs. Defendant stated that he traveled to Wilmington via Highway 117. The victim's wallet was found under a bridge on Highway 117. The victim's truck was found abandoned a mere seven blocks from the phone booth which defendant used to call his father on the night of the killing. When Mr. Herring's truck was discovered, there was an Olde English beer can in the bed of the truck. According to the clerk at the Scotchman, the defendant purchased an Olde English beer the night of the murder.

Finally, we reiterate that for purposes of ruling on a motion to dismiss, all of the evidence, whether competent or incompetent, must be considered by the trial court. *State v. McCullers*, 341 N.C. at 28-29, 460 S.E.2d at 168. Therefore, notwithstanding our holding in the next assignment of error, we find that the defendant's own statement to Agent Kennedy raises a reasonable inference of defendant's guilt. During the booking process, Agent Kennedy encouraged the defendant to "tell the truth" so that the "bad feeling in his stomach" would go away. The defendant responded, "Man, you know the position I'm in, I can't tell you about it." The defendant's response tends to indicate his knowledge of and participation in the killing of Thomas Herring.

When this evidence is viewed in the light most favorable to the State, including all reasonable inferences that may be drawn therefrom, we hold that it is sufficient to withstand defendant's motion to dismiss, as it clearly supports a reasonable inference that the defendant was the perpetrator of Thomas Herring's murder. Therefore, this assignment of error is overruled.

In his second assignment of error, the defendant contends that the trial court erred by denying his pretrial motion to suppress his 19 August 1992 statement to Agent Kennedy because it was elicited from defendant after he had invoked his right to remain silent. We agree.

On 19 August 1992, defendant was questioned by the agents investigating Thomas Herring's murder. The defendant was already in police custody on other charges. He was read his *Miranda* rights, and as on other occasions, the defendant waived his rights and talked with the officers about the events which led to his termination from Gold Banner. However, when informed that he was going to be charged with Herring's murder, the defendant twice denied any knowledge of the killing. When one of the agents indicated a willingness to stay and continue talking, the defendant stood up and said, "I got nothing to say." The officers immediately ceased the interrogation, charged the defendant with Thomas Herring's murder and turned him over to Agent Kennedy for booking.

During the booking process, however, Agent Kennedy began a conversation with the defendant which Kennedy testified at the suppression hearing was for the purpose of learning whether or not the defendant had killed Thomas Herring. Agent Kennedy encouraged the defendant to "tell the truth" so that the "bad feeling in his stomach" would go away. The defendant responded, "Man, you know the position I'm in, I can't tell you about it." This statement was elicited from defendant within fifteen minutes of the conclusion of the first interrogation. At no point during this conversation did Agent Kennedy readvise the defendant of his constitutional rights.

[2] The State first argues that the defendant's theory of inadmissibility was not presented to the trial court, that it was raised for the first time on this appeal, and therefore, this assignment of error is not properly before this Court.

During the pretrial suppression hearing, the defendant argued that he should have been readvised of his *Miranda* rights prior to any further interrogation by Agent Kennedy. Both the trial court and the State recognized such argument by the defendant. While not specifically argued by the defendant at the suppression hearing, it is implicit in the defendant's argument that Agent Kennedy would not have been required to readvise defendant of his rights unless the defendant had invoked his right to remain silent. Although the issue of defendant's invocation of his right to remain silent was not clearly and directly presented to the trial court, we conclude that the defendant's theory was implicitly presented to the trial court and thus is properly before this Court.

[3] The State next contends that the defendant's argument is without merit because the defendant never actually invoked his right to

silence. We disagree. It is clear that a criminal defendant who has been advised of and has waived his rights has the right to terminate a custodial interrogation by indicating "in any manner, [and] at any time prior to or during questioning, that he wishes to remain silent." *Miranda v. Arizona*, 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723 (1966).

In the case *sub judice*, the defendant's conduct, in abruptly standing up, combined with his unambiguous statement, "I got nothing to say," were clear indicators that he wished to terminate the interrogation and invoke his right to remain silent. The defendant similarly had indicated a desire to end two prior interrogations by standing up. Thus, the defendant's conduct ending the 19 August 1992 interrogation was consistent with his conduct ending the two previous interrogations. Finally, the fact that the interrogating officers immediately ceased the interrogation and took the defendant to be "booked" makes it equally clear that the officers understood that the defendant was terminating the interrogation and invoking his right to remain silent.

[4] The fact that the defendant indicated his desire to remain silent does not, however, end our inquiry. The vast majority of federal and state courts have held that the *Miranda* opinion does not create a *per se* prohibition against further interrogation once a defendant has invoked his right to remain silent.[1] In *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313 (1975), the United States Supreme Court discussed the circumstances under which an interrogation may be resumed after the accused has elected to terminate questioning pursuant to his rights under *Miranda*. The Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley*, 423 U.S. at 104, 46 L. Ed. 2d at 321.

---

1. The present case differs slightly from a situation in which a defendant has invoked his right to counsel. In *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981), the United States Supreme Court emphasized its belief that "additional safeguards are necessary when the accused asks for counsel," and adopted a *per se* rule that once an accused has invoked his right to have counsel present, the police may not resume the interrogation until counsel has been made available or until the accused himself initiates further communications with the police and waives his right to counsel. *Id.* at 484-85, 68 L. Ed. 2d at 386. This Court has followed the *per se* rule of *Edwards*. *See State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992). We note that the defendant in this case at no time invoked and does not contend to have invoked his right to counsel. Further, we decline to expand *Edwards* to those situations where the defendant has only invoked his right to remain silent.

In *Mosley*, the defendant was arrested in the early afternoon and taken to police headquarters for questioning. After being fully advised of his *Miranda* rights, Mosley read and signed the department's constitutional rights notification certificate. The arresting officer began questioning Mosley and when Mosley replied that he did not want to answer any questions, the officer immediately ended the interrogation. Mosley was taken back to his cell. Shortly after 6:00 p.m., another police officer took Mosley from his cell to an office in the homicide bureau for questioning about a murder which occurred in another robbery. Before being questioned regarding the second crime, Mosley was informed of his *Miranda* rights and again signed the notification of rights form. Mosley ultimately confessed and was convicted of the murder. The *Mosley* Court held that the statement obtained from the defendant after the second interrogation was admissible at his trial because the police had "scrupulously honored" Mosley's right to cut off questioning. *Id.* at 104, 46 L. Ed. 2d at 321. In so holding, the Court noted that the police immediately ceased the initial interrogation after Mosley invoked his right to remain silent, that the police attempted no further interrogation until a significant period of time had elapsed, that fresh *Miranda* warnings were issued and that the police limited the second interrogation to a different crime. *Id.* at 104-05, 46 L. Ed. 2d at 321-22.

Many of the substantive features leading the Court in *Mosley* to determine that the defendant's rights were "scrupulously honored" are lacking in the present case. The agents questioning the defendant in the initial interview immediately ceased their interrogation after defendant invoked his right to remain silent. This, however, is where any similarity to *Mosley* ends. Less than fifteen minutes after the initial interrogation ended, Agent Kennedy began a conversation with defendant for the purpose of learning whether or not the defendant had killed Thomas Herring. Contrary to the State's assertions, there is no evidence in the record that the defendant initiated this conversation. Based on his own testimony, it is clear that Agent Kennedy initiated the conversation and that the conversation concerned the same subject matter as that which was discussed during the immediately preceding interrogation. Finally, Agent Kennedy did not readvise the defendant of his *Miranda* rights prior to initiating this conversation.

The defendant interprets *Mosley* to establish a *per se* prohibition against reinterrogation unless the detainee has been readvised of his *Miranda* rights. While some courts have established just such a requirement, the majority of decisions addressing the issue do not

ASSOCIATED MECHANICAL CONTRACTORS v. PAYNE

[342 N.C. 825 (1996)]

interpret *Mosley* to insist on fresh *Miranda* warnings as a prerequisite to reinterrogation. A *per se* rule requiring mandatory rewarning places form over substance and does not adequately emphasize the substantive conduct required by law enforcement officers after an accused has asserted his right to remain silent. Therefore, whether or not the defendant has been readvised of his *Miranda* rights prior to the resumption of questioning, is but one factor to consider when determining if the defendant's rights were "scrupulously honored."

Based on the facts in the case *sub judice*, we cannot say that the defendant's right to cut off questioning was "scrupulously honored." Where, as in the instant case, the police cease the interrogation but then resume the interrogation within fifteen minutes of the time the defendant invoked his right to remain silent, the second interrogation involves the same subject matter as the earlier interrogation, and the defendant is not readvised of his *Miranda* rights, the defendant's Fifth Amendment right to remain silent is violated. Because we cannot say that the admission of defendant's statement was harmless beyond a reasonable doubt, the defendant is entitled to a new trial on all the convictions.

In light of our holding on the second issue, we do not find it necessary to address the defendant's remaining assignments of error. Accordingly, for error in admitting the challenged statement, this case is remanded to the Superior Court, Pender County, for a new trial.

NEW TRIAL.