Kevin M. STOCK, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9732.

Court of Appeals of Alaska.

Aug. 22, 2008.

---

21. *See Mahan,* 51 P.3d at 966.

22. *See* Alaska R.Crim. P. 47(b).

Brian T. Duffy, Assistant Public Advocate, and Joshua P. Fink, Public Advocate, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

Kevin M. Stock was convicted, after a jury trial, of assault in the first degree, a class A felony.[1] The State alleged that Stock invited David Lynch back to his apartment, where he beat up Lynch with a boot cast that belonged to Lynch. On appeal, Stock asserts that Superior Court Judge Eric Smith erred in admitting his statements to the police. He contends that the police violated his constitutional rights in obtaining the statements.

Stock also argues that Judge Smith erred in allowing Lynch's mother to testify, in response to a question submitted by a juror, about whether she noticed injuries to Lynch that resulted from the assault. Stock argues that Lynch's mother had insufficient personal knowledge to answer the question and that her testimony introduced a new theory of the case (that Lynch suffered protracted impairment of his health as a result of the assault).

For the reasons explained here, we reject Stock's claims of error.

### Factual and procedural background

On May 12, 2005, Palmer Police Officers Jamie Hammons and Kelly J. Turney responded to a 911 call reporting a disturbance at an apartment building in Palmer. Upon arrival, Officer Hammons placed Stock in handcuffs and asked him some questions while Officer Turney attempted to get a statement from Lynch, who was injured. Because Turney was unable to get a coherent statement from Lynch, he left Lynch with the medics and joined Hammons in questioning Stock. Hammons told Turney that he had established that Stock had asked Lynch to leave his apartment. Stock stated that he told Lynch to leave four times. Turney asked Stock why he had not called the police. Stock responded that he wanted to see if

1. AS 11.41.200(a)(1), (b).

Lynch would leave on his own. At this point, Turney asked Hammons whether he had given Stock *Miranda*[2] warnings. When Hammons said he had not, Turney read Stock his *Miranda* rights.

After reading Stock his *Miranda* rights, Officer Turney asked Stock whether he understood each of his rights. Stock affirmatively answered, "Yes, sir." Turney then asked Stock, "Having those rights in mind, do you want to answer some questions for me?" Stock responded, "It depends what the questions are." Turney suggested "go[ing] one [question] at a time." Stock responded by stating, "Ask me one."

From this point on, Stock chose to answer some questions but not others. In refusing to answer one question, Stock stated, "I know my rights." He refused to answer some questions by simply not answering. At other times, he told Turney, "Ask me another question."

During this questioning, Stock stated that Lynch was a hitchhiker that he picked up and brought to his apartment. They consumed some alcohol. Lynch then tried to steal some of Stock's things. Stock told Lynch to leave several times. When Lynch refused to leave, Stock defended himself. Turney asked Stock several times what happened. But Stock refused to answer some of those questions, either by remaining silent or telling Turney to ask another question.

Toward the end of this interview, Stock stated that he was tired of answering questions.

*Stock:* I'm tired of answering questions.

*Officer Turney:* You're tired of answering questions?

*Stock:* That's my right, right?

*Officer Turney:* Of course it is. So you'll tell me everything except for how he got hurt. That's what I don't understand. But no one else was in the apartment but you two?

*Stock:* Yes, sir.

*Officer Turney:* So obviously . . .

*Stock:* And . . .

*Officer Turney:* Did he hurt himself?

*Stock:* (inaudible reply) [Note: From listening to the tape, it is clear that Stock remains silent here.]

*Officer Turney:* Did he break his own arm and cut his own head?

*Stock:* The arm, I don't know now.

*Officer Turney:* Okay. Then how did he—did he cut his own head?

*Stock:* (inaudible reply) [Note: From listening to the tape, it is clear that Stock remains silent here.]

*Officer Turney:* Did he hit himself with that boot by himself?

*Stock:* I'm tired of answering questions.

At this point, Turney placed Stock under arrest and transported him to the police station. At the police station, Turney asked Stock several questions about his sobriety and asked Stock to take a breath test to determine his level of sobriety. Turney told Stock that the jail needed to do the test to determine if Stock was sober enough to be placed in the general population of the jail. Stock refused to take a breath test. He told Turney that he was "not sober."

The critical part of the interview occurred next. After booking, Stock was placed in a holding cell. He was interviewed in the holding cell about one-half hour after the interview in which he asserted his right to silence. Officer Turney initiated the interview in the following manner:

*Officer Turney:* Hi, Kevin.

*Stock:* Hi.

*Officer Turney:* Can I come in and talk to you for a minute?

*Stock:* Sure. Have a seat.

*Officer Turney:* Okay. Okay. Remember your *Miranda* rights I read you before we left the apartment building?

*Stock:* (inaudible reply) [Note: From listening to the tape, it is clear that Stock remains silent here.]

*Officer Turney:* Remember? That I read—that I read to you, do you remember those?

*Stock:* Yeah.

*Officer Turney:* Okay.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Stock:* So I can deny any questions that you do ask me.

*Officer Turney:* That's correct. You understand all those still?

*Stock:* Well (indiscernable).

*Officer Turney:* Okay. Well, I'm just asking if you still understand.

*Stock:* Yes.

*Officer Turney:* Okay. I'd like to ask you a couple more questions if I can. Is that okay with you? And we can go question by question again, like you talked about.

*Stock:* And I can refuse to answer?

*Officer Turney:* Of course you can. Of course you can.

*Stock:* All right. All right.

During this interview, Stock made several self-incriminating statements. Stock told Turney that, when Lynch refused to leave, he "wanted to kill him," and that he "wanted him dead." Stock stated that he wished Lynch "was fucking dead, the cocksucker."

Before trial, Stock moved to suppress all his statements. He argued that the police had taken the statements in violation of his *Miranda* rights. Judge Smith granted Stock's motion in part. Judge Smith suppressed the statements that Stock made before Stock received *Miranda* warnings. He ruled that the later statements that Stock made to Officer Turney were admissible up to the time when Stock affirmed that he was tired of answering questions. Judge Smith suppressed the ensuing statements Stock made at the apartment, as well as the statements Stock made at the police station when Turney asked him to take a breath test. But Judge Smith held that the statements Stock made to Turney later in the holding cell were admissible. Stock appeals this decision. He asserts that the entirety of the interview in the holding cell should have been suppressed.

At trial, Stock also challenged the admissibility of the testimony of Ronilee Batey, Lynch's mother. Over Stock's objection, Judge Smith allowed Batey to answer a question submitted by a juror regarding whether she had noticed any increased injuries from the assault. Judge Smith also allowed the prosecutor to ask Batey a follow-up question about what specific injuries she had noticed. Stock appeals these decisions.

*Why we uphold Judge Smith's ruling admitting Stock's statements to the police*

On appeal, Stock does not challenge the portions of Judge Smith's ruling that were favorable to him: the suppression of Stock's pre-*Miranda* warning statements, the suppression of the portion of Officer Turney's first interview that occurred after Stock asserted his right to silence, and the suppression of Stock's statements made during booking. Stock argues that these violations "tainted" his later confessions, and that the resolution of this case turns on an analysis under *Brown v. Illinois*[3] or *Oregon v. Elstad.*[4]

Under the *Brown* test, which was superseded by *Elstad* under federal law, if a suspect made an unwarned confession, then any post-*Miranda* warning statement was presumptively inadmissible. To rebut the presumption that the later statements were tainted by the suspect's initial admissions, the government needed to show that there was a break in the chain of events.[5] But in *Elstad,* the United States Supreme Court held that an initial failure of law enforcement officers to administer *Miranda* warnings, without more, did not presumptively taint a subsequent confession obtained after the suspect had been fully advised of and waived those rights.[6] Alaska courts have not ruled which test, *Elstad* or *Brown,* applies as a matter of Alaska constitutional law.

Judge Smith found a *Miranda* violation and suppressed Stock's initial statements. Stock asserts that his pre-*Miranda* warning statements tainted all his post-*Miranda* warning statements. We think it is plausible that Officer Hammons's pre-*Miranda* warn-

**3.** 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**4.** 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

**5.** *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62.

**6.** *Elstad,* 470 U.S. at 300, 105 S.Ct. at 1288.

ing questions were on-the-scene questions and not custodial interrogation. But even if we accept Judge Smith's ruling that there was a *Miranda* violation, nothing that Stock said during this initial portion of the interview "let the cat out of the bag."[7] In other words, Stock did not make any significantly incriminating statements prior to being given *Miranda* warnings.[8] He told Hammons only that he had asked Lynch to leave his apartment, that he had asked Lynch to leave four times, and that he did not call the police to get Lynch to leave the apartment because he wanted to see if Lynch would leave on his own. Even under *Brown,* we think Officer Turney's subsequent full advisement of *Miranda* warnings was sufficient to dissipate any taint from these pre-*Miranda* warning statements.[9]

But the crux of Stock's argument is not resolved by either *Brown* or *Elstad.* Stock argues that Turney's failure to respect Stock's invocation of his right to silence tainted not only the remainder of the initial interview, but also the subsequent interview in the holding cell.

■ The parties do not contest that, prior to these statements in the holding cell, Stock had exercised his right to silence by asserting that he was "tired of answering questions."[10] In *Elstad,* the Supreme Court made clear that cases "concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation" are "inapposite" to the discussion in *Elstad.*[11] The pertinent analysis is whether Stock's right to cut off questioning was "scrupulously honored," as required by *Michigan v. Mosley.*[12]

■ Under *Miranda,* once a person in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."[13] As recognized in *Mosley,* this passage could be interpreted to prohibit all subsequent custodial interrogation by any police officer, at any time or place, on any subject. Or the passage could require merely the immediate cessation of questioning and allow resumption after a momentary respite.[14] In order to avoid the "absurd and unintended results" from either of these possible interpretations, the *Mosley* Court concluded that the admissibility of statements obtained after a person in custody asserts the right to remain silent depends on whether the right to cut off questioning was "scrupulously honored."[15] In *Mosley,* the Supreme Court stated:

> The critical safeguard ... is a person's "right to cut off questioning." Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under [*Miranda*] on whether his "right to cut off questioning" was "scrupulously honored."[16]

In the *Mosley* opinion, the Court reviewed the circumstances leading to Mosley's confession and determined that "his 'right to cut off

7. *Halberg v. State,* 903 P.2d 1090, 1099 (Alaska App.1995).

8. *See id.*

9. *See id.* at 1093.

10. *See Munson v. State,* 123 P.3d 1042, 1046–49 (Alaska 2005) (holding that a suspect's statement, "Well, I'm done talkin' then," was an unequivocal invocation of his right to silence).

11. *Elstad,* 470 U.S. at 314 n. 3, 105 S.Ct. at 1296 n. 3.

12. 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975).

13. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627.

14. *Mosley,* 423 U.S. at 101–02, 96 S.Ct. at 325–26.

15. *Id.* at 102–04, 96 S.Ct. at 326.

16. *Id.* at 103–04, 96 S.Ct. at 326 (internal citations omitted).

questioning' was fully respected." [17] After being fully advised of his rights, Mosley stated that he did not wish to discuss the robbery offense for which he was being held, and the interrogation promptly stopped.[18] More than two hours later, a different officer carefully advised Mosley of his *Miranda* rights, obtained a waiver, and questioned Mosley on an unrelated homicide.[19] The police, in summary, "immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." [20] The Court held that the statements made during the second interrogation were admissible and did not violate the principles of *Miranda*.[21]

Whether Stock's right to silence was "scrupulously honored" turns on our application of *Mosley* to Stock's case. Stock exercised his right to silence at the end of the first interview with Officer Turney by asserting that he was "tired of answering questions." Turney did not stop the first interview until Stock had asserted twice that he was tired of answering questions. About one-half hour later, Turney re-initiated an interrogation on the same subject matter as the first interrogation—after reminding Stock of his *Miranda* rights, but not fully repeating them.

Some courts have interpreted *Mosley* literally and strictly. For example, the Tenth Circuit has stated that, "[O]fficers can reinitiate questioning only if: (1) at the time the defendant invoked his right to remain silent,

the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; [and] (4) the subject of the second interrogation was unrelated to the first." [22] Under this test, Stock's statements in the holding cell would be suppressed.

However, the Tenth Circuit has acknowledged that reasonable judges could conclude that *Mosley* does not require such a broad restriction on the resumption of custodial interviews. In an unpublished decision, the Tenth Circuit concluded that the Kansas Supreme Court's more flexible interpretation of *Mosley* was not unreasonable.[23]

Most courts have not interpreted *Mosley* as dictating a list of requisites, but instead as providing guidance for a case-by-case inquiry into all the relevant facts to determine whether the suspect's rights have been respected.[24] As the Fourth Circuit stated, "*Mosley* does not prescribe a bright-line test to determine whether a suspect's right to cut off questioning was 'scrupulously honored.' Instead, the touchstone is whether a 'review of the circumstances' leading up to the suspect's confession reveals that his 'right to cut off questioning was fully respected.' " [25]

Some courts have determined that before an accused's previously asserted right to remain silent may be deemed to have been "scrupulously honored," law enforcement officers must, at a minimum, re-administer *Miranda* warnings. For example, in *State v.*

17. *Id.* at 104, 96 S.Ct. at 326–27.

18. *Id.* at 104, 96 S.Ct. at 327.

19. *Id.* at 97–98, 96 S.Ct. at 323–24.

20. *Id.* at 106, 96 S.Ct. at 327.

21. *Id.* at 107, 96 S.Ct. at 328.

22. *United States v. Rambo,* 365 F.3d 906, 911 (10th Cir.2004) (quoting *United States v. Glover,* 104 F.3d 1570, 1580 (10th Cir.1997)). *Accord United States v. Alexander,* 447 F.3d 1290, 1294 (10th Cir.2006).

23. *Robinson v. Attorney General of State of Kansas,* 28 Fed.Appx. 849, 853, 2001 WL 1515841 at *3–4 (10th Cir. Nov.29, 2001).

24. *See, e.g., Weeks v. Angelone,* 176 F.3d 249, 267–68 (4th Cir.1999); *Kelly v. Lynaugh,* 862 F.2d 1126, 1130 (5th Cir.1988); *State v. Murphy,* 342 N.C. 813, 467 S.E.2d 428, 435 (1996).

25. *Angelone,* 176 F.3d at 268 (quoting *Mosley,* 423 U.S. at 104, 96 S.Ct. at 326–27) (other citations and internal quotation marks omitted). *Accord Dewey v. State,* 169 P.3d 1149, 1154 (Nev. 2007) (holding that the *Mosley* factors are not inflexible constraints but instead are "relevant factors to be considered in determining if the police 'scrupulously honored' the defendant's right to remain silent" (citing *United States v. Hsu,* 852 F.2d 407, 410 (9th Cir.1988))).

*Hartley,*[26] Hartley was arrested and stated, after being advised of his *Miranda* rights, "I don't believe I want to make a statement at this time."[27] The authorities asked Hartley no questions at that time. More than one hour later, the same agent told Hartley that he wanted him "to reconsider and now is the time if you are going to make a statement."[28] Subsequently, Hartley gave a full confession.[29] The New Jersey Supreme Court held that an assertion of the right to silence can be scrupulously honored only if, at a minimum, the suspect is given fresh *Miranda* warnings.[30] Because the agent re-interviewed Hartley without re-administering *Miranda* warnings, the court concluded that the right to remain silent was not honored and that Hartley's statement "must therefore be deemed to have been unconstitutionally compelled."[31] The New Jersey court declared that administering fresh *Miranda* warnings is "indispensable to a permissible resumption of custodial interrogation of a previously-warned suspect."[32]

Similarly, the Ninth Circuit in *United States v. Hsu,*[33] found that re-administration of *Miranda* warnings was the most important *Mosley* factor. In *Hsu,* a DEA agent arrested Hsu, read him his *Miranda* rights, and obtained a waiver. But after answering a few questions, Hsu asked if he could remain silent. The agent promptly stopped the interview.[34] Subsequently, another agent placed Hsu in her car, drove him to a co-defendant's house, and conducted a search of that house. After the search, another agent, who did not know that Hsu had previously invoked his right to remain silent, advised Hsu of his *Miranda* rights, obtained a waiver, and interrogated Hsu—obtaining a confession.[35] The parties agreed that the amount of time between the interviews was at most thirty minutes.[36] On appeal, Hsu argued that, because such a short period of time elapsed between the first and second interviews and because the agent questioned him on the same subject matter, the second interrogation violated the Fifth Amendment.[37] The Ninth Circuit concluded that while the short passage of time "might ordinarily incline us toward a conclusion that [the] right to cut off questioning was not respected,"[38] they rejected a bright-line rule barring any questioning that takes place within an hour of an invocation of *Miranda* rights.[39] The Ninth Circuit emphasized that the most important factor—or perhaps even "[t]he crucial factor"—was the provision of a fresh set of *Miranda* warnings.[40] The court determined that the fresh warnings and a valid waiver, in addition to the deferential conduct of the agents involved, "militat[ed] toward a finding that Hsu's right to cut off questioning was scrupulously honored."[41]

But other courts view the question of whether the suspect was re-advised of his *Miranda* rights as just one factor to consider when determining if the suspect's rights were "scrupulously honored." In *State v. Murphy,*[42] the North Carolina Supreme Court considered a case in which a defendant waived his *Miranda* rights and talked with police agents regarding the events that led to termination from his job. When the agents informed Murphy that he was going to be charged with the murder of his previous co-

26. 103 N.J. 252, 511 A.2d 80 (1986).

27. *Id.* at 83.

28. *Id.*

29. *Id.*

30. *Id.* at 84.

31. *Id.* at 85.

32. *Id.* at 88.

33. 852 F.2d 407 (9th Cir.1988).

34. *Id.* at 409.

35. *Id.*

36. *Id.* at 411.

37. *Id.* at 409.

38. *Id.* at 412.

39. *Id.* at 411.

40. *Id.* (quoting *United States v. Heldt,* 745 F.2d 1275, 1278 n. 5 (9th Cir.1984)).

41. *Id.*

42. 342 N.C. 813, 467 S.E.2d 428 (1996).

worker, Murphy twice denied knowing anything about the homicide and eventually stated, "I got nothing to say."[43] The agents immediately ceased the interrogation, charged Murphy with the murder, and turned him over to another agent for booking.[44] Within fifteen minutes of the conclusion of the first interrogation, the booking agent initiated a conversation with Murphy, without re-administering *Miranda* rights, in which he encouraged Murphy to " 'tell the truth' so that the 'bad feeling in his stomach' would go away."[45] Murphy responded, "Man, you know the position I'm in, I can't tell you about it."[46] The North Carolina Supreme Court emphasized that the question of whether the defendant had been re-advised of *Miranda* rights was just one factor to consider when determining if the defendant's rights were scrupulously honored.[47] But the court reversed Murphy's conviction because the police resumed the interrogation within fifteen minutes of the time Murphy invoked his right to remain silent, the second interrogation involved the same subject matter as the earlier interrogation, and the defendant was not re-advised of his *Miranda* rights.[48]

In *Weeks v. Angelone,*[49] the Fourth Circuit concluded that the Supreme Court of Virginia had reasonably applied the *Mosley* test when the Virginia court concluded that the police had "scrupulously honored" a defendant's right to remain silent even though the officer asked Weeks only if he remembered his rights prior to the second interrogation, and Weeks responded that he did. At 7:40 a.m., Weeks was read his *Miranda* rights, and after he invoked his right to remain silent, the questioning immediately ceased.[50] At 6:00 p.m., Weeks was brought to the lounge of the prosecutor's office and interviewed again by the same officer. The officer asked Weeks whether he remembered the rights he had been read earlier in the day, and Weeks answered affirmatively. The officer then proceeded to summarize the evidence against Weeks and explained to Weeks that this was his opportunity to provide his explanation of what happened at the shooting. Weeks then confessed.[51] On appeal, Weeks argued that three of the *Mosley* factors had been violated: a significant amount of time had not passed between interrogations, no new *Miranda* warnings were given, and the second interrogation concerned the same crime that was the subject of the first interrogation.[52]

In addressing Week's challenge, the Fourth Circuit noted that whether the police waited a significant period of time does not require a durational minimum—instead courts look "to what degree the police 'persist[ed] in repeated efforts to wear down [the suspect's] resistance and make him change his mind.' "[53] The court found it reasonable for the Supreme Court of Virginia to conclude that more than ten hours was sufficient in this case.[54] With regard to the fact that Weeks had not received a fresh set of *Miranda* warnings prior to the second interview, the court noted that, "The fact that incomplete *Miranda* warnings, or no warnings at all, are given prior to the second interrogation is not decisive."[55] The court found this principle particularly apt in this situation, where "Weeks apparently was aware of his *Miranda* rights and voluntarily chose not to exercise them."[56] The fact that Weeks chose to speak with the same officer to whom he had previously asserted his right

43. *Id.* at 433.

44. *Id.*

45. *Id.*

46. *Id.*

47. *Id.* at 435.

48. *Id.*

49. 176 F.3d 249 (4th Cir.1999).

50. *Id.* at 267.

51. *Id.*

52. *Id.* at 267–68.

53. *Id.* at 268 (alteration in original) (quoting *Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327).

54. *Id.*

55. *Id.* (citations omitted).

56. *Id.* at 269.

to cut off questioning was evidence that Weeks was comfortable exercising his rights—an indication that his decision to talk to the officer was a product of volition rather than coercion.[57] Lastly, with regard to whether the second interrogation concerned a crime that was the subject of the first interrogation, the court concluded that when other factors indicate that a defendant's right to cut off questioning was "scrupulously honored," questioning about the same crime "does not necessarily render a confession derived from the second interrogation unconstitutionally invalid under *Mosley*." [58] Overall, looking at the totality of the circumstances, the Fourth Circuit found it reasonable for the Supreme Court of Virginia to conclude that the police "scrupulously honored" Weeks's right to cut off questioning.[59]

■ Having considered all of the foregoing authorities, we find ourselves in agreement with those jurisdictions that do not view *Mosley* as creating a set of hard-and-fast requirements. We conclude that the *Mosley* decision points to the factors that must be considered when assessing whether a suspect's right to cut off questioning was scrupulously honored. Each of these factors must be considered, but no single factor is determinative, either in its presence or its absence.

Under this interpretation of *Mosley*, there are several problematic aspects of Officer Turney's renewed interview with Stock in the holding cell. Turney was the same officer who had interviewed Stock the first time. This second interview took place about one-half hour after the first interview. Moreover, the second interview focused on the same subject matter as the first—and it is clear that Turney was attempting to get Stock to answer the type of question that Stock had previously refused to answer: questions dealing with how Lynch had come to be injured at Stock's apartment. And

finally, Turney did not re-administer full *Miranda* warnings to Stock; rather, he simply reminded Stock of the earlier advisement of rights.

On the other hand, several aspects of the situation support the superior court's ruling. When Turney came to Stock's holding cell, he asked Stock for permission to enter, and Stock's immediate response was, "Sure. Have a seat." Even though Turney did not repeat the full set of *Miranda* warnings, when Turney asked Stock whether he remembered his *Miranda* rights, Stock's response showed that he did recall his right to remain silent— Stock immediately asserted (and Turney agreed) that he could refuse to answer any questions. Turney then proposed that the holding cell interview proceed in the same manner as the earlier interview: with Stock having the right to decide, on a question-by-question basis, whether he would answer Turney's inquiries. Stock replied, "All right. All right."

Weighing all of these factors, we conclude that Turney satisfied *Mosley's* mandate of "scrupulously honoring" Stock's right to cut off questioning. Accordingly, we affirm the superior court's decision to allow the State to introduce the statements Stock made during the holding cell interview.

Stock also argues that his statements were not voluntary. But Stock never obtained a ruling from Judge Smith on this issue. He therefore did not preserve this issue for appeal.[60] We find no plain error. The record shows that Stock was a relatively sophisticated defendant who knew his rights and exercised them.

*Why we conclude that Judge Smith did not abuse his discretion in admitting the testimony of Lynch's mother*

We next address Stock's claim that Judge Smith erred by admitting the testimony of Ronilee Batey, the victim's mother.

---

**57.** *Id.*

**58.** *Id.* (citations omitted).

**59.** *Id.*

**60.** *See, e.g., Marino v. State*, 934 P.2d 1321, 1327 (Alaska App.1997) (finding that a defendant can-

not raise an issue on appeal if he chose to proceed at trial without seeking a ruling on the merits of his motion on that issue); *Erickson v. State*, 824 P.2d 725, 733 (Alaska App.1991) ("[I]n order to properly preserve this issue for appeal, it was [the defendant's] duty to insist that the trial court rule on his motion.").

By the time of Stock's trial, David Lynch had died from causes unrelated to the injuries he received from Stock's assault. The State called Lynch's mother, Batey, as a witness. Batey explained how, prior to the assault in this case, Lynch broke his ankle when he slipped in her driveway. He had surgery on the ankle and was using a cane and wearing a hard plastic boot cast to protect the ankle.

Judge Smith had established a procedure where he allowed jurors to submit proposed questions for witnesses. A juror submitted a proposed question for the court to ask Batey: "Did you notice increased injuries from the assault?"

In a bench conference, Stock's attorney objected to this question. She asserted that Lynch "led a very unhealthy lifestyle." She argued that Batey's answer to this question would not have any foundation and would open up Lynch's lifestyle of alcohol abuse. But Judge Smith allowed the question. In response to the question whether she noticed increased injuries from the assault, Batey simply answered "Yes." Judge Smith asked whether Lynch was on any pain medication. Batey again answered "Yes." When Judge Smith asked how strong the medication was, Batey responded that she thought he was taking codeine.

At this point, the prosecutor asked Batey what specific injuries from the assault she had noticed. Stock's attorney again objected. But Judge Smith overruled the objection, directing Batey to restrict her answer to what she personally knew, and not to testify about what Lynch or the doctor had told her. Batey testified that there was "a definite change in [Lynch] after the assault." She stated that he had gone to the hospital several times, was in the hospital four days, and the doctors had run all kinds of tests. She said that the tests were inconclusive but that they were "based upon head injuries." She stated that Lynch would sit at home, cry, and just kind of "space out."

Stock's attorney again objected. Although she initially asked for a mistrial, she ultimately asked for either a mistrial or the opportunity to cross-examine Batey about Lynch's lifestyle to provide an alternative explanation for his post-assault behavior. She also asked for discovery of Lynch's medical records. Judge Smith allowed Stock's attorney to cross-examine Batey about the limits of Batey's knowledge of Lynch's injuries and her knowledge of his severe alcoholism as an explanation for his post-assault symptoms. Judge Smith told Stock's attorney that she could subpoena the hospital records and that he would allow her to further develop explanations for Lynch's post-assault behavior based on those records.

■ On appeal, Stock argues that Batey's testimony introduced an entirely new theory of assault in the first degree. One of the elements that the State had to prove to convict Stock of assault in the first degree was that Stock caused serious physical injury to Lynch. By statute, there are two ways to show serious physical injury. First, the State could show that Stock caused physical injury to Lynch by "an act performed under circumstances that create[d] a substantial risk of death." [61] Second, the State could show that Stock had inflicted physical injury to Lynch that caused "serious and protracted impairment of health." [62] Stock argues that the State had only asserted the first theory of serious physical injury—"physical injury caused by an act performed under circumstances that create[d] a substantial risk of death." Stock argues that Batey's testimony interjected the second theory of serious physical injury into the case—that Lynch suffered "protracted impairment of [his] health." He argues that he was prejudiced.

But Stock never objected to Batey's testimony on this ground. And he never objected to the jury instructions that allowed the jurors to consider both theories of serious physical injury. He therefore did not preserve this issue for appeal, and we do not find plain error.

■ There remains Stock's objection that Judge Smith abused his discretion in allowing Batey to testify about Lynch's post-assault injuries. But, as we have previously set out, the only remedy Stock's attorney ultimately asked for was to cross-examine

61. AS 11.41.200(a)(1) and AS 11.81.900(b)(56)(A).

62. AS 11.41.200(a)(1) and AS 11.81.900(b)(56)(B).

Batey about Lynch's unhealthy lifestyle to provide an alternate explanation for his post-assault symptoms. Judge Smith allowed this cross-examination and left open the possibility that Stock could present other evidence if Lynch's medical records supported additional cross-examination. Stock never asked for additional cross-examination. We accordingly conclude that Stock did not preserve this issue for appeal. We do not find plain error. It appears that Stock may well have had a tactical reason for bringing out Lynch's unhealthy lifestyle and alcoholism to suggest alternative explanations for how he was injured and the extent of his injuries.

*Conclusion*

We conclude that Judge Smith did not err in allowing the State to introduce Stock's statements into evidence. The State did not violate Stock's *Miranda* rights in obtaining the statements. We also conclude that Judge Smith did not commit plain error in allowing Lynch's mother to testify about her son's post-assault behavior.

The judgment of the superior court is AFFIRMED.